**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

JUDGE SHARON INGRAM
MARCHMAN

CIVIL ACTION NO. 16-0515

VERSUS

JUDGE S. MAURICE HICKS, JR.

BRIAN E. CRAWFORD, ET AL.

MAGISTRATE JUDGE PEREZ-MONTES

**MEMORANDUM RULING**

Before the Court is a Motion to Dismiss by Defendant Lawrence W. Pettiette, Jr. ("Pettiette") (Record Document 10) for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Pettiette seeks dismissal of Plaintiff Judge Sharon Ingram Marchman's ("Marchman") federal civil rights lawsuit on the basis that the Court does not have subject matter jurisdiction over her claims. See id. For the reasons which follow, Defendants' 12(b)(1) Motion to Dismiss is hereby **DENIED AS MOOT IN PART** and **DENIED IN PART**.

**FACTUAL AND PROCEDURAL BACKGROUND**

Marchman is an elected Louisiana district judge of the Fourth Judicial District Court ("Fourth JDC") for the parishes of Ouachita and Morehouse, and has served in that capacity since 2000. See Record Document 22 at ¶¶ 5 A, 19. Defendants Frederic C. Amman ("Amman"), J. Wilson Rambo ("Rambo"), and Carl V. Sharp ("Sharp") are also elected district judges in the Fourth JDC. See id. at ¶¶ 5 F-H. Defendant Benjamin Jones ("Jones") is a former district judge and the current Court Administrator of the Fourth JDC. See id. at ¶ 5 I. Defendant Allyson Campbell ("Campbell") is a non-attorney law clerk for the Fourth JDC. See id. at ¶ J. Defendant James D. "Buddy" Caldwell ("Caldwell") is the former Attorney General of the State of Louisiana. See id. at ¶ 5 D. Defendant Pettiette is

a Shreveport attorney and acted as a Special Assistant Attorney General when he was appointed to defend Campbell in a previous related lawsuit. See id. at ¶ 5 C. Defendant Brian E Crawford ("Crawford") is a Monroe attorney who served as co-counsel with Pettiette in defending Campbell in that lawsuit. See id. at ¶ 5 B. Defendant Jon K. Guice ("Guice") is a Monroe attorney who served as the attorney for Amman, Rambo, Sharp, and Jones in a previous related lawsuit. See id. at ¶ 5 E.

This litigation, as well as several other related cases, involves allegations that Campbell has engaged in a number of unethical and/or illegal activities during her tenure as a law clerk for the Fourth JDC. See id. at ¶¶ 7-18. According to Marchman, Campbell's misdeeds began as early as 2010, when Campbell began missing work. See id. at ¶ 19. When another law clerk reported Campbell's absences to Marchman, who was the chair of the personnel committee for the Fourth JDC, she discussed the matter with the judges for whom Campbell worked at the time, Rambo and Amman. See id. Rambo and Amman responded that they had no complaints with Campbell's work. See id. According to Marchman, she reminded Rambo and Amman that Court policy required employees to work at the courthouse and not from home. See id.

In 2012, Monroe attorney Cody Rials ("Rials") allegedly complained to Sharp (for whom Campbell was now working) that Campbell had shredded a proposed judgment Rials had submitted in a case before Sharp. See id. at ¶ 20. Evidently, Sharp investigated the complaint and determined that Campbell had bragged to a witness about destroying the document. See id. at ¶ 21. Despite this discovery, Sharp allegedly did nothing other than remove Campbell from any matters in which Rials was involved and inform Rials by letter that his complaints were reasonable. See id. at ¶ 22. Sharp did not make Marchman

aware of this situation at the time despite her position as the head of the personnel committee. See id. at ¶ 23.

On July 3, 2013, Stanley R. Palowsky, III, ("Palowsky") and his corporation Alternative Environmental Solutions, Inc. ("AESI") filed suit in the Fourth JDC against Palowsky's former business partner, W. Brandon Cork. See id. at ¶ 24. This lawsuit was assigned to Rambo. See id. According to Defendants, prior to becoming a judge, Marchman served as an attorney for Palowsky's father. See Record Document 40-1 at 2; see also In re Curry, 16 So. 3d 1139 (La. 07/01/09). Marchman's attorneys in the instant action, Joseph R. Ward, Jr. ("Ward") and Sedric Earl Banks ("Banks") also represented Palowsky and AESI in Palowsky v. Cork. See Record Document 20-1 at 8; see also Record Document 22 at ¶ 40.

On April 1, 2014, Laura Hartt ("Hartt"), then the Court Administrator of the Fourth JDC, became aware that it was possible to run "key fob" reports on the electronic keys that Fourth JDC employees use to enter the courthouse. See Record Document 22 at ¶ 25. Hartt reported this fact to Marchman, who sought authorization from the chief judge of the Fourth JDC, then Waddell Manning ("Manning"), to investigate the key fob reports and corroborating video footage for Campbell for the first quarter of 2014. See id. at ¶¶ 25-26. Once Manning granted this authorization, a deputy judicial administrator undertook this investigation and found some discrepancies between the key fob and video evidence and the timesheets reporting Campbell's work hours on seven work days during the first quarter of 2014. See id. at ¶ 26. Allegedly, both Rambo and Amman had been approving Campbell's false timesheets during this time. See id. ¶ 27. Hartt also researched the crime

of payroll fraud and concluded that it was a crime for a public employee to be paid for time that she did not actually work. See id. at ¶ 28.

On April 15, 2014, Defendant Guice[1] allegedly asked Hartt whether the court was an "auditee" for the purposes of La. R.S. 24:523, which requires the agency head of an organization that is an "auditee" to immediately notify the legislative auditor and the district attorney once he or she becomes aware of any misappropriation of public funds. See id. at ¶ 30. According to Marchman, no such notification was ever made despite the findings of the investigation into Campbell's timesheets. See id. at ¶ 30.

After this investigation, the Fourth JDC judges held several meetings in which this matter was discussed, and they implemented new measures to prevent payroll fraud. See id. at ¶¶ 29, 31. Beginning on April 22, 2014, all law clerks were required to sign in and out each time they entered or left the building. See id. at ¶ 32. Campbell allegedly refused to comply with this requirement and falsified her sign-in sheet. See id. On April 24, 2014, at another judges' meeting, the judges agreed to remove Campbell from the position of "senior law clerk," terminate her stipend, suspend her for one month without pay, and reprimand her for her attendance issues and her behavior towards the staff of the human resources department. See id. at ¶ 33.

While Campbell was serving her suspension in May 2014, 52 pending post-conviction relief applications were found underneath a couch in Campbell's office. See id. at ¶ 34. The oldest of these applications was dated November 2, 2011, and it was Campbell's job to address these petitions. See id. Campbell allegedly had no explanation

---

[1] Though the Defendant judges later hired Guice in relation to compliance with public records requests, see infra at 7, it is not clear from the Amended Complaint how or why Guice became involved at this stage of the case. See Record Document 22 at ¶ 30.

for why these applications were under a couch, and she allegedly gave a $200 gift card to the employee who found the applications under her couch at some point after the applications were found. See id. On June 17, 2014, Marchman recused herself from investigating these issues because she heard that Campbell was actively seeking someone to oppose her in her upcoming election, leaving Jones to investigate them. See id. at ¶ 35. On July 8, 2014, Jones discussed these issues at a personnel committee meeting, but no remedial action was taken against Campbell. See id. at ¶ 36.

On August 10, 2014, Campbell (who also serves as a part-time society columnist) published a column that allegedly caused Rials to again raise his complaint that Campbell had shredded a proposed judgment in one of his cases. See id. at ¶ 37. According to Marchman, Campbell's column contained several statements that, though they did not directly address Rials, were aimed at goading Rials by flaunting the fact that Campbell had gotten away with shredding his document without any consequences. See id. at ¶ 37. Rials emailed his complaint to a court employee, and the email was eventually given to Marchman. See id. at ¶ 38. According to Marchman, this second attempt by Rials to raise the issue of the allegedly shredded judgment was the first time Marchman gained any knowledge of the incident. See id. Marchman then turned the matter over to the chief judge, who ordered Rials to put his complaint in writing and officially submit it to the court. See id. Despite another investigation into the matter, allegedly including confirmation to Sharp and Jones by the same witness that Campbell had bragged about destroying the proposed judgment, the investigation was closed without any actions being taken against Campbell. See id. at ¶ 39.

On August 13, 2014, Banks met with Hartt about several complaints in the Palowsky v. Cork litigation. See id. at ¶ 40. He complained that multiple pleadings that had been filed were missing and that information was being withheld from Rambo in the matter. See id. Banks also questioned Hartt about Rials' complaints about Campbell. See id. Rambo later discussed Banks' complaint about Campbell in a personnel committee meeting, but stated that no documents were missing from the record. See id. at ¶ 41. Marchman, however, alleges that documents were missing from the record and that Banks' investigation had proven that such documents were missing. See id. After this personnel committee meeting, Hartt wrote to Banks in a September 11, 2014, letter that the reason that some pleadings did not make it to Rambo was a recent conversion to a new filing system. See id. at ¶ 42.

On September 12, 2014, the Fourth JDC judges held an *en banc* meeting. See id. at ¶ 43. Though Marchman did not attend, she later listened to an audio recording of the meeting. See id. at ¶ 43. At this meeting, Jones discussed potentially putting a reprimand letter in Campbell's file about the 52 missing post-conviction relief applications that had been found in her office, and the judges also discussed complaints by "two local attorneys" regarding Campbell's actions in their cases. Id. at ¶ 43.

On September 22, 2014, Banks wrote to Hartt asking why the investigation into his complaints had merely consisted of asking Rambo what had happened in the case. See id. at ¶ 44. Additionally, Banks asked about "sealed evidence of criminal activity" that Banks had provided to Rambo weeks earlier but which allegedly still had not been seen by Rambo. Id. It is not clear from the Amended Complaint what response, if any, Rambo

made. However, on October 23, 2014, Palowsky filed a motion to recuse Rambo from presiding over Palowsky v. Cork, and Rambo granted the motion. See id. at ¶ 45.

On November 3, 2014, Campbell emailed Sharp seeking to have Sharp contradict Rials' allegations against her. See id. at ¶ 46. Sharp responded that he had found that no misconduct had been "indicated," a response that is allegedly inconsistent with his 2012 letter to Rials stating that Rials' concerns were reasonable. Id. Sharp later supplemented this email at Campbell's request with another email stating that Campbell had never shredded anything. See id.

At some point in November or December 2014, the legislative auditor found that some employees had been paid for time that had not actually been worked. See id. at ¶ 47. On December 30, 2014, the judges held a specially-called meeting to discuss this issue. See id. The substance of the discussion at this meeting is not clear from the complaint. See id. Eventually, local newspaper The News-Star ran a story about the legislative auditor's report. See id. at ¶ 50.

On December 31, 2014, Jones retired from the bench. See id. at ¶ 48. He eventually replaced Hartt as Court Administrator on March 2, 2015, after Hartt resigned from this position. See id.

From February 11 to March 10, 2015, Johnny Gunter, a reporter with another newspaper, The Ouachita Citizen, sent a series of public records requests to the Fourth JDC requesting certain records related to Campbell, including personnel records and timesheets, on behalf of the newspaper. See id. at ¶ 49. The Defendant judges and now-Chief Judge Stephens Winters (who is not a party to the instant action) hired Guice to advise them on how to respond to the requests. See Record Document 37-1 at 3. Guice

advised the judges to comply with some of the requests and file a declaratory judgment action seeking a ruling that some of the other requests sought personnel files that were confidential and could not be disclosed to the public. See id.

On March 13, 2015, the judges of the Fourth JDC held another meeting. See id. at ¶ 51. At this meeting, Marchman moved to terminate Campbell's employment due to the significant amount of resources being devoted to handling public records requests related to Campbell. See id. The motion was unsuccessful, as no one seconded the motion. See id. Amman allegedly screamed at Marchman that Marchman only wanted to fire Campbell because of what was being written about Campbell in the newspapers. See id. at ¶ 51.

In this same meeting, the judges discussed the response to Gunter's public records requests. See id. at ¶ 52. Jones informed the judges that, immediately prior to the meeting, Campbell had given him a folder with three documents, all of which "contained outright accusations and thinly-veiled threats against Judge Marchman." Id. These documents also contained a statement that Campbell had never worked on the Palowsky v. Cork case and that Rambo had informed the attorneys in that case of that fact. See id. Marchman had never seen these documents before this meeting. See id.

On March 20, 2015, Gunter filed a criminal complaint against the Fourth JDC for its refusal to fully comply with the public records requests he had made on behalf of *The Ouachita Citizen*. See id. at ¶ 53. The judges of the Fourth JDC called an emergency meeting. See id. Marchman did not attend this meeting, but later reviewed an audio recording of the meeting. See id. According to her, at this meeting the judges decided to take Guice's advice and file a petition for declaratory judgment against *The Ouachita*

*Citizen* "to avoid any adverse investigation by the district attorney and to appear to the public as if the court were taking 'the high road.'" See id. at ¶ 53.

On April 14, 2015, the judges held another meeting in which they discussed what documents should be produced to the *ad hoc* judge presiding over the court's declaratory judgment action. See id. Allegedly, Winters and Jones argued for turning over only the Rials letter and an outside consultant's report, but Marchman argued for turning over all documents regarding Campbell to the *ad hoc* judge. See id. at ¶ 54. Jones allegedly stated that there will be no testimony at the upcoming May 19, 2015, hearing because "testimony will not be good for us." See id. On April 30, 2015, Marchman wrote to Winters repeating her arguments regarding which documents to turn over. See id. at ¶ 55. On May 15, 2015, she repeated these same arguments in a meeting with Winters, Jones, and Guice. See id. at ¶ 56.

On May 19, 2015, the *ad hoc* judge in the declaratory judgment action held a hearing at which counsel for Campbell (not a defendant in the instant action) and Guice argued that documents related to Campbell were part of Campbell's private employee file and were not subject to production. See id. at ¶ 57. Guice also argued that there were only rumors and accusations about document destruction by Campbell with no eyewitnesses, though according to Marchman, Guice "knew full well that was not the case." Id. at 58. The *ad hoc* judge ruled that the Court had properly responded to the public records requests already and that the documents related to Campbell did not have to be produced because Campbell's privacy interest outweighed the public's right of access to the documents. See Record Document 40-5 (Winters v. Hanna Media, No. 15-0770, Fourth Judicial District Court, Parish of Ouachita, Louisiana).

On July 22, 2015, Winters and Jones met with Marchman and allegedly pressured her to recuse herself from the investigation of an employee who had requested her recusal without providing her with a reason to do so. See id. at ¶ 60. Marchman refused, stating that she would not recuse herself until they provided her with a concrete reason as to why she should recuse herself. See id. By this point, Marchman alleges that "it was now abundantly clear to Judge Marchman that she was being prohibited from doing her job as the chair of the personnel committee." See id. at ¶ 61. According to her, "she had to get permission from the chief judge or Defendant Jones for anything she needed to do, though in her previous years as chair, she had been trusted to do her job." Id. This made Jones the "de facto head of the personnel committee." Id. Thus, on July 22, 2015, Marchman resigned as chair and member of the personnel committee. See id. at ¶ 62.

Also on July 22, 2015, Palowsky filed a lawsuit against Campbell in state court, accusing Campbell of criminal conduct in destroying and/or otherwise improperly handling documents in the Palowsky v. Cork matter. See Record Document 40-6 (Palowsky v. Campbell, Docket No. 15-2179, Fourth Judicial District Court, Parish of Ouachita, Louisiana). In that suit, Palowsky made many of the same allegations as contained in the Amended Complaint in the instant action. See id. Then-Louisiana Attorney General Caldwell appointed Pettiette to serve as a Special Assistant Louisiana Attorney General to represent Campbell in this litigation. See Record Document 22 at ¶ 5 C. Campbell also retained Crawford to represent her in this matter. See id. at ¶ 5 B.

Throughout this time period, the Defendant judges' "hostile and demeaning treatment of Judge Marchman continued," with the conflict between Marchman and Campbell being referred to as a "cat fight." Record Document 22 at ¶ 63. On August 10,

2015, Sharp accused Marchman of leaking information to Palowsky, an accusation that Marchman denied. See id. at ¶ 64.

On August 17, 2015, Palowsky served subpoenas duces tecum upon Sharp, Jones, Winters, and Marchman to produce documents related to the investigation of Campbell in connection with an upcoming hearing to recuse the entire Fourth JDC in the Palowsky v. Cork matter. See id. at ¶ 65. On August 18, 2015, Guice filed a motion to quash the subpoenas with a proposed order that allegedly was so broad that it "would arguably have encompassed the subpoena to Judge Marchman even though she had not sought relief" from the subpoena. Id. at ¶ 66. Though the amended complaint never expressly states that his motion to quash was granted, it appears that Sharp, who was presiding over the case, granted the motion to quash and signed Guice's proposed order. See id.

On August 19, 2015, Marchman encountered Sharp in the Fourth JDC break room. See id. at ¶ 67. According to Marchman, Sharp then "proceeded to have an *ex parte* conversation about the subpoena duces tecum" in which he stated that he had granted the motion to quash because Jones had told him to do so. See id. at ¶ 67. Additionally, Sharp and Marchman discussed the applicability of the order on the motion to quash to Marchman, with Marchman asserting that it did not apply to her. See id. at ¶ 68. According to Marchman, Sharp then stated that he agreed that the order did not apply to Marchman. See id.

On August 20, 2015, Sharp presided over Palowsky's motion to recuse the entire Fourth JDC bench from the Palowsky v. Cork matter. See id. at ¶ 69. Near the end of this hearing, Marchman spoke up to make her return on the subpoena duces tecum that

Palowsky had issued to her.[2] See id. at ¶ 69. During the ensuing discussion on the record, Sharp allegedly spoke to Marchman "in a threatening tone and accused her of misinterpreting or misremembering what he had said the day before." Id. Sharp then stated "comply with the subpoena if you wish. Give it to the litigants." Id. When Marchman questioned this directive, Sharp told her to give the documents in question to Palowsky's counsel and told him to "do with it what you will." Id. Guice then approached Sharp and had an off-the-record discussion with him, and the hearing ended. See id.

On September 2, 2015, Sharp went to Marchman's office and asked her if she would attend the upcoming en banc judges' meeting on September 4. See id. at ¶ 70. When Marchman replied that she planned on attending, Sharp responded that he intended to move to have her admonished by the en banc judges. See id. When Marchman asked why he intended to do so, Sharp allegedly first stated that Marchman knew why and then stormed out of Marchman's office. See id. at ¶ 70. Upon further questioning, Sharp allegedly stated that the admonishment would be for "that little stunt she pulled in his courtroom the other day." Id.

On September 3, 2015, Rambo allegedly glared at Marchman and refused to speak to her when he encountered her while exiting an elevator. See id. at ¶ 71.

_____

[2] What happened at this hearing, which documents were contained in Marchman's return on the subpoena duces tecum, and the consequences or inferences to be drawn therefrom about both Marchman's and her attorneys' conduct is a major topic of disagreement in the two pending Motions for Sanctions in the instant action. See Record Documents 60, 82. The version of events contained in the instant factual summary is the version contained in the Amended Complaint, as the Court must take all of Marchman's allegations as true for the purposes of a 12(b)(1) motion that makes a "facial attack" on the court's subject matter jurisdiction. See Record Document 22; see Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980).

Additionally, Marchman alleges that Rambo intentionally walked into Marchman while he was exiting the elevator. See id.

On September 4, 2015, the judges of the Fourth JDC held an *en banc* meeting. See id. at ¶ 72. Sharp had placed a "confidential" matter on the agenda for this meeting. See id. Marchman alleges that this matter was his motion to admonish Marchman. See id. At the meeting, Sharp stated he had to do more research before taking up the matter. See id.

On November 2, 2015, Campbell and her counsel (Crawford, Pettiette, and Caldwell) filed pleadings (presumably the motions to strike and exceptions of no cause of action discussed below, see *infra* at 14) in the Palowsky v. Campbell matter in which they accused Marchman of "improperly disclosing information about Campbell, committing illegal acts, and having a 'vendetta' against Campbell." Id. at ¶ 73. These attorneys alleged that Marchman had disclosed information from Campbell's confidential employee file in contravention of the *ad hoc* judge's order that this information was to remain confidential. See id. at ¶ 76. According to these attorneys, Marchman made this disclosure "to advance disagreements with her colleagues" in the Fourth JDC. Id. ¶ 77. Marchman alleges that these accusations are meritless and that her only disclosure was her disclosure in response to Palowsky's valid subpoena duces tecum in the Palowsky v. Cork matter at the August 20, 2015 hearing. See id. at ¶ 79.

Additionally, Marchman alleges that Guice contributed to drafting these pleadings by working with Crawford, Pettiette, and Caldwell on them. See id. at ¶ 80. Marchman alleges that Guice knew the statements contained in these pleadings to be false because he was in the courtroom when Sharp ordered Marchman to comply with the subpoena

duces tecum by giving documents to Palowsky's counsel. See id. at ¶ 80. She also alleges that in contributing to drafting these pleadings, Guice "was representing the Defendant judges adversely to Marchman on issues on which he had previously provided her with representation." See id.

On November 12, 2015, the *ad hoc* judge that had been appointed to handle the Palowsky v. Campbell matter held a hearing on motions to strike and exceptions of no cause of action by Campbell and the Defendant judges. See Record Document 40-11. At that hearing, the *ad hoc* judge granted the motions to strike and the exceptions of no cause of action on judicial immunity grounds, thereby dismissing the suit. See id. at 23. An appeal from that decision is currently pending with the Louisiana Second Circuit Court of Appeal. See Record Document 40-1 at 24; see Palowsky, et al. v. Campbell, et al., No. 51,003-CA, Second Circuit Court of Appeal.

On December 4, 2015, during the Fourth JDC's monthly *en banc* meeting, Amman moved to require *en banc* approval for all videos and photographs taken in the courthouse. See id. at ¶ 81. The motion passed as modified to require the approval of only the chief judge rather than *en banc* approval. See id. According to Marchman, this motion was in response to several recent newspaper articles that had been favorable to Marchman. See id. Marchman alleges that Amman introduced this motion to retaliate against Marchman and to keep her from having any positive press. See id.

On January 29, 2016, Winters sent an email to Sharp and another judge requesting that they add Marchman to their contact lists and to let her know when committee meetings were called.  See id. at ¶ 82. On January 31, 2016, Sharp replied to Winters' email, stating that he was unwilling to notify Judge Marchman of meetings and would not

serve on any committees with her. See id. at ¶ 83. According to Marchman, Sharp sent this email to other judges of the Fourth JDC as well as court staff members "to undermine Judge Marchman's authority and standing as a duly-elected judge." Id. Marchman alleges that Defendants' actions are ongoing, and that the Defendant judges and Campbell continue to retaliate against Marchman at the Fourth JDC courthouse. See id. at ¶ 84.

Marchman filed the instant federal civil rights lawsuit on April 19, 2016. See Record Document 1. She argues that Defendants' actions have caused her a loss of reputation, "turned her into a virtual pariah at the courthouse," caused her to lose her position as chair and member of the personnel committee, and generally have harmed her ability to perform her duties as a judge. Record Document 22 at ¶¶ 85-96. On May 6, 2016, Pettiette filed a Rule 12(b)(1) Motion to Dismiss for lack of subject matter jurisdiction. See Record Document 10. On May 13, 2016, Marchman filed an Amended Complaint in which she clarified that she is suing all of the Defendant judges, Pettiette, and Caldwell for damages in their individual capacities and is seeking only prospective injunctive relief, declaratory relief, and attorney's fees against the Defendant judges and Pettiette in their official capacities.[3] See Record Document 22 at ¶ 6.

---

[3] In the section of her Amended Complaint making these clarifications, Marchman does not mention Guice and Crawford in her individual capacity claims and does not mention Crawford in her official capacity claims. See Record Document 22 at ¶ 6. However, Marchman alleges that Guice, Crawford, and Caldwell were acting under color of state law by defending the Defendant judges and Campbell in prior lawsuits, and she makes allegations about all of these Defendants throughout the Amended Complaint. See Record Document 22 at ¶ 5 B, D, and E. Thus, for the purposes of this Memorandum Ruling, the Court assumes that Marchman is also suing Guice and Crawford in their individual capacities for damages and is also suing Crawford in his official capacity for declaratory relief, injunctive relief, and attorney's fees.

In the Amended Complaint, Marchman also added several new causes of action. See id. at ¶¶ 103-105 and 112-114. Thus, Marchman's causes of action are as follows: (1)-(3) 42 U.S.C. § 1983, 1985, 1986 causes of action against all Defendants for violation of the First Amendment right to freedom of speech; (4)-(6) 42 U.S.C. § 1983, 1985, and 1986 causes of action against all Defendants for violation of the Fourteenth Amendment right to equal protection; (7)-(10) 28 U.S.C. §§ 2201-2202 causes of action against all Defendants for injunctive relief to prevent future violations of the First and Fourteenth Amendments and declaratory relief that Defendants' past actions violated the First and Fourteenth Amendments. See id. at ¶¶ 97-122. Finally, Marchman also seeks her attorney's fees pursuant to 42 U.S.C. § 1988. See id. at ¶¶ 123-124.

Between March 20, 2016, and June 22, 2016, all Defendants other than Pettiette also filed Motions to Dismiss; all of these Defendants filed Rule 12(b)(6) Motions to Dismiss, while some of them also filed Rule 12(b)(1) Motions to Dismiss. See Record Documents 26, 35, 37, 40, and 47. Crawford and Campbell also filed Motions for Sanctions. See Record Documents 60, 82. In the instant Memorandum Ruling, the Court addresses Pettiette's Rule 12(b)(1) Motion to Dismiss.

**LAW AND ANALYSIS**

I.    **LEGAL STANDARDS**

   A.  **The Rule 12(b)(1) Standard**

Federal Rule of Civil Procedure 12(b)(1) allows parties to challenge a federal district court's subject matter jurisdiction. When a defendant files such a motion, the plaintiff, as the party asserting federal jurisdiction, bears the burden of establishing that the Court has jurisdiction. New Orleans & Gulf Coast Ry. Co. v. Barrois, 533 F.3d 321,

327 (5th Cir. 2008). When a party challenges the court's subject matter jurisdiction based only on the complaint, it is a "facial attack," and the court scrutinizes the pleadings, taking the allegations as true, to determine whether the claimant has sufficiently alleged subject matter jurisdiction. Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980). Conclusory allegations, however, do not have to be taken as true. See Lacano Invs., LLC v. Balash, 765 F.3d 1068, 1071 (9th Cir. 2014).

### B.  Liability of State Officials in Section 1983 Actions

The Eleventh Amendment applies to claims against states, state entities, and state officials sued in their official capacity because Congress did not intend to abrogate Eleventh Amendment immunity when it passed Section 1983 and its accompanying statutes. See Quern v. Jordan, 440 U.S. 332, 342 (1979). Therefore, federal courts do not have jurisdiction to issue a judgment awarding damages to a plaintiff against state officials sued in their official capacity for a federal civil rights violation pursuant to Section 1983 and its accompanying statutes. See Edelman v. Jordan, 415 U.S. 651, 663 (1974). Such actions are barred by the Eleventh Amendment. See id.

However, there are two ways in which a plaintiff may maintain a federal civil rights lawsuit against a state official without the action being barred by the Eleventh Amendment. First, a plaintiff may sue a state official in his or her individual capacity for damages for an alleged constitutional violation. See Hafer v. Melo, 502 U.S. 21, 30-31 (1991). If such an action is successful, only the state official, not the state itself, is liable for payment of any damages. See id.

Second, a plaintiff may sue a state official in his or her official capacity for prospective injunctive relief to prevent future federal constitutional or federal statutory

violations under the Ex Parte Young doctrine. 209 U.S. 123 (1908). This doctrine "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law," even if substantial costs to a State would result therefrom. See Milliken v. Bradley, 433 U.S. 267, 289 (1977). To determine whether a plaintiff has alleged a proper claim under the Ex Parte Young doctrine, a federal court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md. Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (internal citations and quotations omitted). The Ex Parte Young doctrine also extends to allow a federal court to grant declaratory relief when there are ongoing or threatened violations of federal law. See Green v. Mansour, 474 U.S. 64, 73 (1985); see also Alden v. Maine, 527 U.S. 706, 757 (1999).

## II.   ANALYSIS

Pettiette argues that, as a Special Assistant Attorney General of the State of Louisiana, his Eleventh Amendment immunity deprives the Court of subject matter jurisdiction over Marchman's claims against him for both (1) damages and (2) prospective injunctive relief in his official capacity. See Record Document 10-1.  As stated above, see supra at 16, after Pettiette filed the instant Motion to Dismiss, Marchman filed an Amended Complaint in which she clarified that she was suing Pettiette for damages in his individual capacity rather than his official capacity. See Record Document 22 at ¶ 6.

Amended pleadings supersede prior pleadings, and Marchman no longer seeks damages from Pettiette in his official capacity. See id.; see Ath. Training Innovations, LLC v. Etagz, Inc., 2013 U.S. Dist. LEXIS 12508 at *8-9 (E.D. La. 2013); see also NTR Bullion Grp., LLC v. Liberty Metals Grp., LLC, 2014 U.S. Dist. LEXIS 54495 at *2-3 n.1 (N. D.

Tex. 2014) (a court may treat a motion to dismiss directed at a superseded pleading as if it were addressed to an amended pleading, but only when the defects in the superseded pleading reappear in the amended pleading). Thus, Pettiette's argument on the damages claim is moot, and the sole question before the Court in the instant Motion to Dismiss is whether the Court has subject matter jurisdiction over Marchman's claim against Pettiette in his official capacity for declaratory relief, injunctive relief, and attorney's fees.

This question turns on "a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md. Inc., 535 U.S. at 635. The allegations must simply be "sufficient to demonstrate the ongoing nature of the alleged unconstitutional conduct, which a federal court could remedy through prospective relief." NiGen Biotech, LLC v. Paxton, 804 F.3d 389, 395 (5th Cir. 2015). In NiGen Biotech, LLC, the district court had dismissed all of the plaintiff's constitutional claims against the Texas Attorney General on sovereign immunity grounds. See id. at 392. The Fifth Circuit reversed the district court's dismissal of these claims insofar as they were for prospective relief because the plaintiff had made "straightforward allegations" that the Attorney General's refusal to justify for over four years certain threatening letters it sent to the plaintiff constituted several constitutional violations. Id. at 395. In so deciding, the court did not discuss the merits of these claims or whether the plaintiff's factual allegations actually stated a federal constitutional claim; rather, the question was merely whether the plaintiff's complaint, on its face, fit into the Ex Parte Young exception such that the federal courts had subject matter jurisdiction over the plaintiff's claims. See id.

Here, Marchman alleges that Pettiette's actions in defending Campbell in the Palowsky v. Campbell matter constituted a violation of her constitutional rights, and that Pettiette's actions continue to violate her constitutional rights to this day. See Record Document 22 at ¶ 84. Notably, though Palowsky lost at the district court, it is undisputed that the appeal of that case to the Louisiana Second Circuit Court of Appeal is still pending. See Record Document 40-1 at 24; see Palowsky, et al. v. Campbell, et al., No. 51,003-CA, Second Circuit Court of Appeal.

Marchman also alleges that Pettiette and the other Defendants' actions were a part of a conspiracy to violate her constitutional rights, and that this conspiracy is ongoing. See Record Document 22 at ¶¶ 100-102 and 109-111. Specifically, Marchman alleges that Pettiette violated her rights by: (1) conspiring with Crawford, Caldwell, and Guice (and, by extension, the Defendant judges and Campbell) to retaliate against Marchman's exercising her First Amendment rights by filing state court pleadings accusing her of wrongful and illegal acts; and (2) giving such allegations an "air of legitimacy" by signing these pleadings as an Assistant Attorney General. Id. at ¶¶ 16, 18, and 73-80. Marchman seeks both declaratory and injunctive relief to prevent the continuation of these alleged constitutional violations in the future. See id. at ¶¶ 115-122.

Applying the "straightforward inquiry" the Supreme Court has required in determining whether Marchman has sufficiently invoked the Ex Parte Young doctrine to establish federal subject matter jurisdiction, the Court finds that she has done so. Verizon Md. Inc., 535 U.S. at 635. She alleges that Pettiette's actions on both an individual basis and as a part of a conspiracy violated her constitutional rights, and that these actions are ongoing. See Record Document 22. Merely the allegation that Pettiette's actions are

ongoing, taken alone, is rather conclusory. However, Pettiette's allegedly unconstitutional actions occurred in a case that is still pending; therefore, his actions could continue to deprive Marchman of her rights if they do in fact constitute a constitutional violation. <u>See</u> <u>NiGen Biotech, LLC</u>, 804 F.3d at 395. For this reason, Pettiette's Rule 12(b)(1) Motion to Dismiss is hereby **DENIED**.

It should be clearly noted that the instant Memorandum Ruling does not address whether Marchman's complaint states a claim for which relief can be granted for the causes of action she has brought, <u>i.e.</u>, whether Marchman's factual allegations, taken as true, state a claim for violations of her First and Fourteenth Amendment rights. The Court is considering that question in considering the numerous Rule 12(b)(6) Motions to Dismiss filed by the other Defendants in the instant action. <u>See</u> Record Documents 26, 35, 37, 40, and 47. Pettiette has not yet filed such a motion, so the instant Memorandum Ruling is limited to the conclusion that Marchman has sufficiently invoked the <u>Ex Parte Young</u> doctrine by seeking prospective injunctive relief against Pettiette such that the Court has subject matter jurisdiction over Marchman's claims against him.

## CONCLUSION

The Court concludes that because Marchman amended her complaint after Pettiette filed the instant Rule 12(b)(1) Motion to Dismiss (Record Document 10), the Motion is moot as to Marchman's superseded claims against Pettiette for monetary damages in his official capacity. Thus, the Motion to Dismiss is hereby **DENIED AS MOOT** with respect to those claims. The Court also concludes that it has subject matter jurisdiction over Marchman's claims against Pettiette in his official capacity for prospective

injunctive relief, declaratory relief, and attorney's fees under the <u>Ex Parte Young Doctrine</u>. Thus, the Motion to Dismiss is hereby **DENIED** with respect to those claims.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, on this the 15th day of December, 2016.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE