# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

JUDGE SHARON INGRAM
MARCHMAN

CIVIL ACTION NO. 16-0515

VERSUS

JUDGE S. MAURICE HICKS, JR.

BRIAN E. CRAWFORD, ET AL.

MAGISTRATE JUDGE PEREZ-MONTES

## MEMORANDUM RULING

Before the Court are Rule 12(b)(1) and 12(b)(6) Motions to Dismiss by Defendants James D. "Buddy" Caldwell, Allyson Campbell, Jon K. Guice, Brian E. Crawford, Lawrence W. Pettiette, Jr., and Judges Frederic C. Amman, Benjamin Jones, J. Wilson Rambo, and Carl V. Sharp. See Record Documents 26, 35, 37, 40, 47, and 90. Defendants seek dismissal of Plaintiff Judge Sharon Ingram Marchman's federal civil rights lawsuit. For the reasons which follow, Defendants' 12(b)(6) Motions to Dismiss[1] are **GRANTED**. Defendants' Rule 12(b)(1) Motions are **DENIED** for the reasons contained in the Court's ruling on Pettiette's Rule 12(b)(1) Motion (Record Document 86), holding that the Court has subject matter jurisdiction over Marchman's official capacity claims.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

This litigation, as well as several other related cases, involves allegations by Judge Sharon Ingram Marchman and others that Allyson Campbell engaged in a number of

---

[1] Federal Rule of Civil Procedure 12(b)(6) states that a party may assert, by motion, the defense that the plaintiff has "fail[ed] to state a claim upon which relief can be granted."

[2] In deciding a Rule 12(b)(6) Motion to Dismiss, a Court must take all of a plaintiff's factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, the facts contained in the "Factual and Procedural Background" section are not findings of fact by the Court, but rather are facts pleaded in Marchman's Amended Complaint that the Court must take as true at this preliminary stage.

unethical and/or illegal activities during Campbell's tenure as a law clerk for the Fourth

JDC. See id. at ¶¶ 7-18. The parties to the instant action are as follows:

1) Plaintiff, Judge Sharon Ingram Marchman ("Marchman"), an elected Louisiana district judge of the Fourth Judicial District Court ("Fourth JDC"). See Record Document 22 at ¶¶ 5 A, 19.

2) Defendant Judge Frederic C. Amman ("Amman"), an elected Louisiana district judge of the Fourth JDC. See id. at ¶ 5 G.

3) Defendant Judge J. Wilson Rambo ("Rambo"), an elected Louisiana district judge of the Fourth JDC. See id. at ¶ 5 H.

4) Defendant Judge Carl V. Sharp ("Sharp"), an elected Louisiana district judge of the Fourth JDC. See id. at ¶¶ 5 F.

5) Defendant Judge Benjamin Jones ("Jones"), a former elected Louisiana district judge of the Fourth JDC and the current Court Administrator of the Fourth JDC. See id. at ¶ 5 I.

6) Defendant Allyson Campbell ("Campbell"), a non-attorney law clerk for the Fourth JDC. See id. at ¶ 5 J.

7) Defendant James D. "Buddy" Caldwell ("Caldwell"), the former Attorney General of the State of Louisiana. See id. at ¶ 5 D.

8) Defendant Lawrence W. Pettiette, Jr. ("Pettiette"), a Shreveport attorney who acted as a Special Assistant Attorney General when Caldwell appointed Pettiette to defend Campbell in the related lawsuit Palowsky v. Campbell, Docket No. 15-2179, Fourth JDC, Parish of Ouachita, Louisiana. See id. at ¶ 5 C.

9) Defendant Brian E. Crawford ("Crawford"), a Monroe attorney who served as co-counsel with Pettiette in defending Campbell in Palowsky v. Campbell. See id. at ¶ 5 B.

10) Defendant Jon K. Guice ("Guice"), a Monroe attorney who served as the attorney for Amman, Rambo, Sharp, Jones, and Chief Judge Stephens Winters in Winters v. Hanna Media, Docket No. 15-0770, Fourth JDC, Parish of Ouachita, Louisiana, and as the attorney for Sharp, Jones, and Winters in opposing subpoenas duces tecum issued to them in the Palowsky v. Cork matter, Docket No. 13-2059, Fourth JDC, Parish of Ouachita, Louisiana. See id. at ¶ 5 E.

Other people who are involved in the case but are not parties are as follows:

1) Cody Rials ("Rials"), a Monroe attorney who complained to Sharp and others at the Fourth JDC that Campbell had shredded a proposed judgment Rials had submitted in a case before Sharp. See id. at ¶ 20.

2) Stanley R. Palowsky, III, ("Palowsky"), a businessman and the son of one of Marchman's former clients who filed two suits related to the instant action, Palowsky v. Cork and Palowsky v. Campbell. See id. at ¶ 24 and 40; see Record Document 40-10.

3) W. Brandon Cork ("Cork"), Palowsky's former business partner who Palowsky sued in Palowsky v. Cork. See Record Document 22 at ¶ 24.

4) Joseph R. Ward, Jr. ("Ward"), one of Marchman's attorneys in the instant action and one of Palowsky's attorneys in both Palowsky v. Cork and Palowsky v. Campbell. See Record Documents 40-3 at 8 and 40-9 at 25-26.

5) Sedric Earl Banks ("Banks"), one of Marchman's attorneys in the instant action and one of Palowsky's attorneys in both Palowsky v. Cork and Palowsky v. Campbell. See id.

6) Laura Hartt ("Hartt"), the former Court Administrator of the Fourth JDC. See Record Document 22 at ¶ 25.

7) Judge Waddell Manning ("Manning"), a former elected Louisiana district judge and Chief Judge of the Fourth JDC. See id. at ¶¶ 25-26.

8) Johnny Gunter ("Gunter"), a reporter with The Ouachita Citizen who sent a series of public records requests to the Fourth JDC requesting certain records related to Campbell, including personnel records and timesheets, on behalf of the newspaper. See id. at ¶ 49.

9) Judge Stephens Winters ("Winters"), an elected Louisiana district judge and current Chief Judge of the Fourth JDC See id. at ¶ 82.

According to Marchman, Campbell's misdeeds began as early as 2010, when Campbell began missing work. See id. at ¶ 19. When another law clerk reported Campbell's absences to Marchman, who was the chair of the personnel committee for the Fourth JDC, she discussed the matter with the judges for whom Campbell worked at the time, Rambo and Amman. See id. Rambo and Amman responded that they had no

complaints with Campbell's work. See id. According to Marchman, she reminded Rambo and Amman that Court policy required employees to work at the courthouse and not from home. See id.

In 2012, Monroe attorney Rials allegedly complained to Sharp (for whom Campbell was now working) that Campbell had shredded a proposed judgment Rials had submitted in a case before Sharp. See id. at ¶ 20. Evidently, Sharp investigated the complaint and determined that Campbell had bragged to a witness about destroying the document. See id. at ¶ 21. Despite this discovery, Sharp allegedly did nothing other than remove Campbell from any matters in which Rials was involved and inform Rials by letter that his complaints were reasonable. See id. at ¶ 22. Sharp did not make Marchman aware of this situation at the time despite her position as the head of the personnel committee. See id. at ¶ 23.

On July 3, 2013, Palowsky and his corporation Alternative Environmental Solutions, Inc. ("AESI") filed suit in the Fourth JDC against Palowsky's former business partner, Cork. See id. at ¶ 24. This lawsuit was assigned to Rambo. See id. According to Defendants, prior to becoming a judge, Marchman served as an attorney for Palowsky's father. See Record Document 40-1 at 2; see also In re Curry, 16 So. 3d 1139 (La. 07/01/09).[3] Marchman's attorneys in the instant action, Ward and Banks, also represented Palowsky and AESI in Palowsky v. Cork. See Record Document 22 at ¶ 40.

---

[3] A court may rely upon "documents incorporated into the complaint by reference and matters of which a court may take judicial notice" in deciding a motion to dismiss. Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008). A court may take judicial notice of facts contained in public records, so long as the facts noticed: (1) are not subject to reasonable dispute; (2) can be accurately and readily determined; (3) from sources whose accuracy cannot reasonably be questioned. See Giraldo v. Kessler, 694 F.3d 161, 164 (2nd Cir. 2012); see Fed. R. Evid. 201(b)(2). The Court finds that all three of these

On April 1, 2014, Hartt, then the Court Administrator of the Fourth JDC, became aware that it was possible to run "key fob" reports on the electronic keys that Fourth JDC employees use to enter the courthouse. See id. at ¶ 25. Hartt reported this fact to Marchman, who sought authorization from the chief judge of the Fourth JDC, then Manning, to investigate the key fob reports and corroborating video footage for Campbell for the first quarter of 2014. See id. at ¶¶ 25-26. Once Manning granted this authorization, a deputy judicial administrator undertook this investigation and found some discrepancies between the key fob and video evidence and the timesheets reporting Campbell's work hours on seven work days during the first quarter of 2014. See id. at ¶ 26; see Record Document 22-1. Allegedly, both Rambo and Amman had been approving Campbell's false timesheets during this time. See Record Document 22 at ¶ 27. Hartt also researched the crime of payroll fraud and concluded that it was a crime for a public employee to be paid for time that she did not actually work. See id. at ¶ 28.

On April 15, 2014, Defendant Guice[4] allegedly asked Hartt whether the court was an "auditee" for the purposes of La. R.S. 24:523, which requires the agency head of an organization that is an "auditee" to immediately notify the legislative auditor and the district attorney once he or she becomes aware of any misappropriation of public funds. See id. at ¶ 30. According to Marchman, no such notification was ever made despite the findings of the investigation into Campbell's timesheets. See id. at ¶ 30.

---

elements are met with respect to In re Curry, 16 So. 3d 1139 (La. 07/01/09), and the fact from that case that Marchman formerly represented Palowsky's father.

[4] Though the Defendant judges later hired Guice in relation to compliance with public records requests, see infra at 7, it is not clear from the Amended Complaint how or why Guice became involved at this stage of the case. See Record Document 22 at ¶ 30.

After this investigation, the Fourth JDC judges held several meetings in which this matter was discussed, and they implemented new measures to prevent payroll fraud. See id. at ¶¶ 29, 31. Beginning on April 22, 2014, all law clerks were required to sign in and out each time they entered or left the building. See id. at ¶ 32. Campbell allegedly refused to comply with this requirement and falsified her sign-in sheet. See id. On April 24, 2014, at another judges' meeting, the judges agreed to remove Campbell from the position of "senior law clerk," terminate her stipend, suspend her for one month without pay, and reprimand her for her attendance issues and her behavior towards the staff of the human resources department. See id. at ¶ 33.

While Campbell was serving her suspension in May 2014, 52 pending post-conviction relief applications were found underneath a couch in Campbell's office. See id. at ¶ 34. The oldest of these applications was dated November 2, 2011, and it was Campbell's job to address these petitions. See id. Campbell allegedly had no explanation for why these applications were under a couch, and she allegedly gave a $200 gift card to the employee who found the applications. See id. On June 17, 2014, Marchman recused herself from investigating these issues because she heard that Campbell was actively seeking someone to oppose her in her upcoming election, leaving Jones to investigate them. See id. at ¶ 35. On July 8, 2014, Jones discussed these issues at a personnel committee meeting, but no remedial action was taken against Campbell. See id. at ¶ 36.

On August 10, 2014, Campbell (who also serves as a part-time society columnist) published a column that allegedly caused Rials to again raise his complaint that Campbell had shredded a proposed judgment in one of his cases. See id. at ¶ 37. According to

Marchman, Campbell's column contained several statements that, though they did not directly address Rials, were aimed at goading Rials by flaunting the fact that Campbell had gotten away with shredding his document without any consequences. See id. at ¶ 37. Rials emailed his complaint to a court employee, and the email eventually found its way to Marchman. See id. at ¶ 38. According to Marchman, this second attempt by Rials to raise the issue of the allegedly shredded judgment was the first time Marchman gained any knowledge of the incident. See id. Marchman then turned the matter over to the chief judge, who ordered Rials to put his complaint in writing and officially submit it to the court. See id. Despite another investigation into the matter, allegedly including confirmation to Sharp and Jones by the same witness that Campbell had bragged about destroying the proposed judgment, the investigation was closed without any action being taken against Campbell. See id. at ¶ 39.

On August 13, 2014, Banks met with Hartt about several complaints in the Palowsky v. Cork litigation. See id. at ¶ 40. He complained that multiple pleadings that had been filed were missing and that information was being withheld from Rambo in the matter. See id. Banks also questioned Hartt about Rials' complaints about Campbell. See id. Rambo later discussed Banks' complaint about Campbell in a personnel committee meeting, but stated that no documents were missing from the record. See id. at ¶ 41. Marchman, however, alleges that documents were missing from the record and that Banks' investigation had proven that such documents were missing. See id. After this personnel committee meeting, Hartt wrote to Banks in a September 11, 2014, letter that the reason that some pleadings did not make it to Rambo was a recent conversion to a new filing system. See id. at ¶ 42.

On September 12, 2014, the Fourth JDC judges held an *en banc* meeting. See id. at ¶ 43. Though Marchman did not attend, she later listened to an audio recording of the meeting. See id. At this meeting, Jones discussed potentially putting a reprimand letter in Campbell's file about the 52 missing post-conviction relief applications that had been found in her office, and the judges also discussed complaints by "two local attorneys" regarding Campbell's actions in their cases. Id.

On September 22, 2014, Banks wrote to Hartt asking why the investigation into his complaints had merely consisted of asking Rambo what had happened in the case. See id. at ¶ 44. Additionally, Banks asked about "sealed evidence of criminal activity" that Banks had provided to Rambo weeks earlier but which allegedly still had not been seen by Rambo. Id. It is not clear from the Amended Complaint what response, if any, Rambo made. However, on October 23, 2014, Palowsky filed a motion to recuse Rambo from presiding over Palowsky v. Cork, and Rambo granted the motion. See id. at ¶ 45.

On November 3, 2014, Campbell emailed Sharp seeking to have Sharp contradict Rials' allegations against her. See id. at ¶ 46. Sharp responded that he had found that no misconduct had been "indicated," a response that is allegedly inconsistent with his 2012 letter to Rials stating that Rials' concerns were reasonable. Id. Sharp later supplemented this email at Campbell's request with another email stating that Campbell had never shredded anything. See id.

At some point in November or December 2014, the legislative auditor found that some employees had been paid for time that had not actually been worked. See id. at ¶ 47. On December 30, 2014, the judges held a specially-called meeting to discuss this issue. See id. The substance of the discussion at this meeting is not clear from the

Amended Complaint. See id. Eventually, local newspaper *The News-Star* ran a story about the legislative auditor's report. See id. at ¶ 50.

On December 31, 2014, Jones retired from the bench. See id. at ¶ 48. He eventually replaced Hartt as Court Administrator on March 2, 2015, after Hartt resigned from this position. See id.

From February 11 to March 10, 2015, Gunter, a reporter with *The Ouachita Citizen*, sent a series of public records requests to the Fourth JDC requesting certain records related to Campbell, including personnel records and timesheets, on behalf of the newspaper. See id. at ¶ 49. The Defendant judges and now-Chief Judge Winters hired Guice to advise them on how to respond to the requests. See Record Document 37-1 at 3. Guice advised the judges to comply with some of the requests and file a declaratory judgment action seeking a ruling that some of the other requests sought personnel files that were confidential and could not be disclosed to the public. See id.; see Record Document 40-5 (Winters v. Hanna Media, No. 15-0770, Fourth JDC, Parish of Ouachita, Louisiana).

On March 13, 2015, the judges of the Fourth JDC held another meeting. See Record Document 22 at ¶ 51. At this meeting, Marchman moved to terminate Campbell's employment due to the significant amount of resources being devoted to handling public records requests related to Campbell. See id. The motion was unsuccessful, as no one seconded the motion. See id. Amman allegedly screamed at Marchman that Marchman only wanted to fire Campbell because of what was being written about Campbell in the newspapers. See id. at ¶ 51.

In this same meeting, the judges discussed the response to Gunter's public records requests. See id. at ¶ 52. Jones informed the judges that just prior to the meeting, Campbell had given him a folder with three documents, all of which "contained outright accusations and thinly-veiled threats against Judge Marchman." Id. These documents also contained a statement that Campbell had never worked on the Palowsky v. Cork case and that Rambo had informed the attorneys in that case of that fact. See id. Marchman had never seen these documents before this meeting. See id.

On March 20, 2015, Gunter filed a criminal complaint against the Fourth JDC for its refusal to fully comply with the public records requests he had made on behalf of *The Ouachita Citizen*. See id. at ¶ 53. The judges of the Fourth JDC called an emergency meeting. See id. Marchman did not attend this meeting, but later reviewed an audio recording of the meeting. See id. According to her, at this meeting the judges decided to take Guice's advice and file a petition for declaratory judgment against *The Ouachita Citizen* "to avoid any adverse investigation by the district attorney and to appear to the public as if the court were taking 'the high road,'" with Chief Judge Winters later filing Winters v. Hanna Media, No. 15-0770, Fourth JDC, Parish of Ouachita, Louisiana.  See id. at ¶ 53; see Record Document 40-5.

On April 14, 2015, the judges held another meeting in which they discussed what documents should be produced to the *ad hoc* judge presiding over Winters v. Hanna Media. See id. at ¶ 54. Allegedly, Winters and Jones argued for turning over only the Rials letter and an outside consultant's report, but Marchman argued for turning over all documents regarding Campbell to the *ad hoc* judge. See id. Jones allegedly stated that there will be no testimony at the upcoming May 19, 2015, hearing because "testimony will

not be good for us." See id. On April 30, 2015, Marchman wrote to Winters repeating her arguments regarding which documents to turn over. See id. at ¶ 55. On May 15, 2015, she repeated these same arguments in a meeting with Winters, Jones, and Guice. See id. at ¶ 56.

On May 19, 2015, the *ad hoc* judge in Winters v. Hanna Media held a hearing at which counsel for Campbell (not a defendant in the instant action) and Guice argued that documents related to Campbell were part of Campbell's private employee file and were not subject to production. See id. at ¶ 57. Guice also argued that there were only rumors and accusations about document destruction by Campbell with no eyewitnesses, though according to Marchman, Guice "knew full well that was not the case." Id. at 58. The *ad hoc* judge ruled that the Court had properly responded to the public records requests already and that the documents related to Campbell did not have to be produced because Campbell's privacy interest outweighed the public's right of access to the documents. See id. at ¶ 59; see Record Document 40-5 (judgment in Winters v. Hanna Media).

On July 22, 2015, Winters and Jones met with Marchman and allegedly pressured her to recuse herself from the investigation of an employee who had requested her recusal without providing her with a reason to do so. See Record Document 22 at ¶ 60. Marchman refused, stating that she would not recuse herself until they provided her with a concrete reason as to why she should recuse herself. See id. By this point, Marchman alleges that "it was now abundantly clear to Judge Marchman that she was being prohibited from doing her job as the chair of the personnel committee." Id. at ¶ 61. According to her, "she had to get permission from the chief judge or Defendant Jones for anything she needed to do, though in her previous years as chair, she had been trusted

to do her job." Id. This made Jones the "*de facto* head of the personnel committee." Id. Thus, on July 27, 2015, Marchman resigned as chair and member of the personnel committee. See id. at ¶ 62.

Also on July 22, 2015, Palowsky filed a civil lawsuit against Campbell in state court, accusing Campbell of criminal conduct in destroying and/or otherwise improperly handling documents in the Palowsky v. Cork matter. See Record Document 40-6 (petition in Palowsky v. Campbell, Docket No. 15-2179, Fourth Judicial District Court, Parish of Ouachita, Louisiana). In that suit, Palowsky made many of the same allegations as contained in the Amended Complaint in the instant action. See id. Then-Louisiana Attorney General Caldwell appointed Pettiette to serve as a Special Assistant Louisiana Attorney General to represent Campbell in this litigation. See Record Document 22 at ¶ 5 C. Campbell also retained Crawford to represent her in this matter. See id. at ¶ 5 B.

Throughout this time period, the Defendant judges' "hostile and demeaning treatment of Judge Marchman continued," with the conflict between Marchman and Campbell being referred to as a "cat fight." Id. at ¶ 63. On August 10, 2015, Sharp accused Marchman of leaking information to Palowsky, an accusation that Marchman denied. See id. at ¶ 64.

On August 17, 2015, Palowsky served subpoenas duces tecum upon Sharp, Jones, Winters, and Marchman to produce documents related to the investigation of Campbell in connection with an upcoming hearing to recuse the entire Fourth JDC in the Palowsky v. Cork matter. See id. at ¶ 65. On August 18, 2015, Guice filed a motion to quash the subpoenas with a proposed order that allegedly was so broad that it "would arguably have encompassed the subpoena to Judge Marchman even though she had not

sought relief" from the subpoena. Id. at ¶ 66. Evidently Sharp, Jones, and Winters had consulted Guice regarding whether they had to comply with the subpoena, but Marchman had not done so. See id. Though the Amended Complaint never expressly states that his motion to quash was granted, it appears that Sharp, who was presiding over Palowsky v. Cork, granted the motion to quash and signed Guice's proposed order. See id.

On August 19, 2015, Marchman encountered Sharp in the Fourth JDC break room. See id. at ¶ 67. According to Marchman, Sharp then "proceeded to have an *ex parte* conversation about the subpoena duces tecum" in which he stated that he had granted the motion to quash because Jones had told him to do so. See id. at ¶ 67. Additionally, Sharp and Marchman discussed the applicability of the order on the motion to quash to Marchman, with Marchman asserting that it did not apply to her. See id. at ¶ 68. According to Marchman, Sharp then stated that he agreed that the order did not apply to Marchman. See id.

On August 20, 2015, Sharp presided over Palowsky's motion to recuse the entire Fourth JDC bench from the Palowsky v. Cork matter. See id. at ¶ 69. Near the end of this hearing, Marchman spoke up to make her return on the subpoena duces tecum that Palowsky had issued to her.[5] See id. at ¶ 69. During the ensuing discussion on the record, Sharp allegedly spoke to Marchman "in a threatening tone and accused her of misinterpreting or misremembering what he had said the day before." Id. Sharp then

---

[5] What happened at this hearing, which documents were contained in Marchman's return on the subpoena duces tecum, and the consequences or inferences to be drawn therefrom about both Marchman's and her attorneys' conduct are major topics of disagreement in the two pending Motions for Sanctions in the instant action. See Record Documents 60, 82. The version of events contained in the instant factual summary is the version contained in the Amended Complaint, as the Court must take all of Marchman's allegations as true for the purposes of a 12(b)(6) motion. See Record Document 22.

stated "comply with the subpoena if you wish. Give it to the litigants." Id. When Marchman questioned this directive, Sharp told her to give the documents in question to Palowsky's counsel and told him to "do with it what you will." Id. Guice then approached Sharp and had an off-the-record discussion with him, and the hearing ended. See id.

On September 2, 2015, Sharp went to Marchman's office and asked her if she would attend the upcoming *en banc* judges' meeting on September 4. See id. at ¶ 70. When Marchman replied that she planned on attending, Sharp responded that he intended to move to have her admonished by the *en banc* judges. See id. When Marchman asked why he intended to do so, Sharp allegedly first stated that Marchman knew why and then stormed out of Marchman's office. See id. at ¶ 70. Upon further questioning, Sharp allegedly stated that the admonishment would be for "that little stunt she pulled in his courtroom the other day." Id.

On September 3, 2015, Rambo allegedly glared at Marchman and refused to speak to her when he encountered her while exiting an elevator. See id. at ¶ 71. Additionally, Marchman alleges that Rambo intentionally walked into Marchman while he was exiting the elevator. See id.

On September 4, 2015, the judges of the Fourth JDC held an *en banc* meeting. See id. at ¶ 72. Sharp had placed a "confidential" matter on the agenda for this meeting. See id. Marchman alleges that this matter was his motion to admonish Marchman. See id. At the meeting, Sharp stated he had to do more research before taking up the matter. See id.

On November 2, 2015, Campbell and her counsel (Crawford, Pettiette, and Caldwell) filed pleadings (presumably the motions to strike and exceptions of no cause of

action discussed below) in the Palowsky v. Campbell matter in which they accused Marchman of "improperly disclosing information about Campbell, committing illegal acts, and having a 'vendetta' against Campbell." Id. at ¶ 73. These attorneys alleged that Marchman had disclosed information from Campbell's confidential employee file in contravention of the *ad hoc* judge's order in Winters v. Hanna Media that this information was to remain confidential. See id. at ¶ 76. According to these attorneys, Marchman made this disclosure "to advance disagreements with her colleagues" in the Fourth JDC. Id. ¶ 77. Marchman alleges that these accusations are meritless and that her only disclosure was her disclosure in response to Palowsky's valid subpoena duces tecum in the Palowsky v. Cork matter at the August 20, 2015 hearing. See id. at ¶ 79.

Additionally, Marchman alleges that Guice contributed to drafting these pleadings by working with Crawford, Pettiette, and Caldwell on them. See id. at ¶ 80. Marchman alleges that Guice knew the statements contained in these pleadings to be false because he was in the courtroom when Sharp ordered Marchman to comply with the subpoena duces tecum by giving documents to Palowsky's counsel. See id. at ¶ 80. She also alleges that in contributing to drafting these pleadings, Guice "was representing the Defendant judges adversely to Marchman on issues on which he had previously provided her with representation." See id.

On November 5, 2015, the *ad hoc* judge that had been appointed to handle the Palowsky v. Campbell matter held a hearing on motions to strike and exceptions of no cause of action by Campbell and the Defendant judges. See Record Document 40-13 (transcript of hearing). At that hearing, the *ad hoc* judge granted the motions to strike and the exceptions of no cause of action on judicial immunity grounds, thereby dismissing the

suit. See id. at 23. An appeal from that decision is currently pending with the Louisiana Second Circuit Court of Appeal. See Record Document 40-1 at 24; see Palowsky, et al. v. Campbell, et al., No. 51,003-CA, Second Circuit Court of Appeal.

On December 4, 2015, during the Fourth JDC's monthly en banc meeting, Amman moved to require en banc approval for all videos and photographs taken in the courthouse. See Record Document 22 at ¶ 81. The motion passed as modified to require the approval of only the chief judge rather than en banc approval. See id. According to Marchman, this motion was in response to several recent newspaper articles that had been favorable to Marchman. See id. Marchman alleges that Amman introduced this motion to retaliate against Marchman and to keep her from having any positive press. See id.

On January 29, 2016, Winters sent an email to Sharp and another judge requesting that they add Marchman to their contact lists and to let her know when committee meetings were called. See id. at ¶ 82. On January 31, 2016, Sharp replied to Winters' email, stating that he was unwilling to notify Judge Marchman of meetings and would not serve on any committees with her. See id. at ¶ 83. According to Marchman, Sharp sent this email to other judges of the Fourth JDC as well as court staff members "to undermine Judge Marchman's authority and standing as a duly-elected judge." Id. Marchman alleges that Defendants' actions are ongoing, and that the Defendant judges and Campbell continue to retaliate against Marchman at the Fourth JDC courthouse. See id. at ¶ 84.

Marchman filed the instant federal civil rights lawsuit on April 19, 2016. See Record Document 1. She argues that Defendants' actions have caused her a loss of reputation, "turned her into a virtual pariah at the courthouse," caused her to lose her position as

chair and member of the personnel committee, and generally have harmed her ability to perform her duties as a judge. Record Document 22 at ¶¶ 85-96. On May 6, 2016, Pettiette filed a Rule 12(b)(1) Motion to Dismiss for lack of subject matter jurisdiction. See Record Document 10. On May 13, 2016, Marchman filed an Amended Complaint in which she clarified that she is suing all of the Defendant judges, Pettiette, and Caldwell for damages in their individual capacities and is seeking only prospective injunctive relief, declaratory relief, and attorney's fees against the Defendant judges and Pettiette in their official capacities.[6] See Record Document 22 at ¶ 6.

In the Amended Complaint, Marchman also added several new causes of action. See id. at ¶¶ 103-105 and 112-114. Thus, Marchman's causes of action are as follows: (1)-(3) 42 U.S.C. §§ 1983, 1985, 1986 causes of action against all Defendants for violation of the First Amendment right to freedom of speech; (4)-(6) 42 U.S.C. §§ 1983, 1985, and 1986 causes of action against all Defendants for violation of the Fourteenth Amendment right to equal protection; (7)-(10) 28 U.S.C. §§ 2201-2202 causes of action against all Defendants for injunctive relief to prevent future violations of the First and Fourteenth Amendments and declaratory relief that Defendants' past actions violated the First and

---

[6] In the section of her Amended Complaint making these clarifications, Marchman does not mention Guice and Crawford in her individual capacity claims and does not mention Crawford in her official capacity claims. See Record Document 22 at ¶ 6. However, Marchman alleges that Guice, Crawford, and Caldwell were acting under color of state law by defending the Defendant judges and Campbell in prior lawsuits, and she makes allegations about all of these Defendants throughout the Amended Complaint. See Record Document 22 at ¶ 5 B, D, and E. Thus, for the purposes of this Memorandum Ruling, the Court assumes that Marchman is also suing Guice and Crawford in their individual capacities for damages and is also suing Crawford in his official capacity for declaratory relief, injunctive relief, and attorney's fees.

Fourteenth Amendments. <u>See id.</u> at ¶¶ 97-122. Finally, Marchman also seeks her attorney's fees pursuant to 42 U.S.C. § 1988. <u>See id.</u> at ¶¶ 123-124.

Between March 20, 2016, and June 22, 2016, all Defendants other than Pettiette also filed Motions to Dismiss; all of these Defendants filed Rule 12(b)(6) Motions to Dismiss, while some of them also filed Rule 12(b)(1) Motions to Dismiss. <u>See</u> Record Documents 26, 35, 37, 40, and 47. In these Motions, Defendants present a variety of arguments regarding why Marchman's claims fail as a matter of law. <u>See id.</u> Crawford and Campbell also filed Motions for Sanctions. <u>See</u> Record Documents 60 and 82. On December 15, 2016, the Court denied Pettiette's Rule 12(b)(1) Motion to Dismiss, ruling that the Court has subject matter jurisdiction over Marchman's official capacity claims. <u>See</u> Record Documents 86 and 87. On January 23, 2017, Pettiette also filed a Rule 12(b)(6) Motion to Dismiss. <u>See</u> Record Document 90. In the instant Memorandum Ruling, the Court addresses Defendants' Rule 12(b)(1) and 12(b)(6) Motions to Dismiss.

## LAW AND ANALYSIS

### I.   LEGAL STANDARDS

#### A. The 12(b)(6) Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief, requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The standard for the adequacy of complaints under Rule 8(a)(2) changed from the old, more plaintiff-friendly "no set of facts" standard to a "plausibility" standard found in <u>Bell Atlantic v. Twombly</u> and its progeny. <u>Twombly</u>, 550 U.S. 544 (2007). Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that

all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555-556. If a pleading only contains "labels and conclusions" and "a formulaic recitation of the elements of a cause of action," the pleading does not meet the standards of Rule 8(a)(2). Iqbal, 556 U.S. at 678 (citation omitted).

In deciding a Rule 12(b)(6) motion to dismiss, a court generally "may not go outside the pleadings." Colle v. Brazos County, Texas, 981 F.2d 237, 243 (5th Cir. 1993). However, a court may also rely upon "documents incorporated into the complaint by reference and matters of which a court may take judicial notice" in deciding a motion to dismiss. Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008). Additionally, Courts must also accept all allegations in a complaint as true. See Iqbal, 556 U.S. at 678. However, courts do not have to accept legal conclusions as facts. See id. Courts considering a motion to dismiss under Rule 12(b)(6) are only obligated to allow those complaints that are facially plausible under the Iqbal and Twombly standard to survive such a motion. See id. at 678-679. If the complaint does not meet this standard, it can be dismissed for failure to state a claim upon which relief can be granted. See id. Such a dismissal ends the case "at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558.

**B.  42 U.S.C. §§ 1983, 1985, and 1986**

Marchman filed suit under 42 U.S.C. §§ 1983, 1985, and 1986, alleging that Defendants deprived her of her First Amendment right to freedom of speech and her Fourteenth Amendment right to equal protection in violation of these statutes. See Record Document 22 at ¶¶ 97-122. Section 1983 provides a private cause of action to a plaintiff whose rights under the United States Constitution or other federal laws have been

violated by a person acting under color of state law. Section 1985 provides a cause of action against persons acting under color of state law who conspire to deprive a person of such rights. Section 1986 provides a cause of action against persons acting under color of state law who neglect to prevent a conspiracy to deprive a person of such rights.

### C. Public Employee First Amendment Claims

The First Amendment to the United States Constitution states "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. Public employees do not give up all of their First Amendment freedom of speech rights as a result of their employment. See Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). However, the First Amendment freedom of speech rights of public employees are more limited than those of the general public. See id. at 417-418.

A public employee claiming a deprivation of First Amendment freedom of speech rights must prove the following elements: (1) the plaintiff engaged in speech as a citizen on a topic of public concern; (2) the plaintiff suffered an adverse employment action; (3) the plaintiff's speech motivated the defendant's decision to take the adverse employment action against the plaintiff; (4) the plaintiff's interest in engaging in the speech outweighs the defendant's interest in promoting efficiency in the workplace; and (5) the plaintiff suffered damages as a result of the defendant's adverse employment action. See id. at 421-22; see also Howell v. Town of Ball, 827 F.3d 515, 522 (5th Cir. 2016), cert. denied, Ball v. Howell, 2017 U.S. LEXIS 732 (U.S., Jan. 17, 2017).

### D. Fourteenth Amendment Equal Protection Claims

The Fourteenth Amendment's Equal Protection Clause states that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.

Const. Amend. XIV, § 1. This Clause directs that similarly situated persons should be treated alike. See Plyler v. Doe, 457 U.S. 202, 216 (1982). Generally, "to state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." Johnson v. Morel, 876 F.2d 477, 479 (1989). Generally, cases involving the Equal Protection Clause are "concerned with governmental classifications that affect some groups of citizens differently than others." Engquist v. Or. Dept. of Agric., 553 U.S. 591, 601 (2008).

However, the Supreme Court has also recognized a "class of one" exception to the requirement that a plaintiff plead that he or she is a member of a protected class to state an equal protection claim. See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000). To state such a claim, a plaintiff must allege that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. at 564. Though the Equal Protection Clause applies to public employees, as a matter of law, "class of one" equal protection claims are not available in the public employment context when the plaintiff claims that "the State treated an employee differently for a bad reason, or for no reason at all." Engquist, 553 U.S. at 606.

## II.   ANALYSIS

### A.  Marchman's First Amendment Claims

Defendants argue that Marchman's allegations, taken as true, do not amount to a violation of her First Amendment rights under the framework the Supreme Court has established for First Amendment claims by public employees. See Record Documents 26-1 at 10-17, 35-1 at 10-12, 37-1 at 9-13, 40-1 at 22-24, 47-2 at 16-18, and 90-1 at 5-7.

They argue that this failure means that Marchman's First Amendment claims must be dismissed. See id. They also argue that because of this failure, Marchman cannot overcome the Defendants' asserted qualified immunity defenses. See id. Marchman responds that Defendants' argument is essentially that "as an elected judge, she has no First Amendment rights," and she argues that her speech in this case constituted speech on issues of current public importance. Record Document 55 at 19-21. She also argues that a different framework for analyzing her claims should apply because she is an elected official. See Record Document 92 at 9-11.

The Court first addresses Marchman's claims under the traditional framework for analyzing First Amendment retaliation claims by public employees. Marchman has not stated a claim for relief under this framework because her allegations, taken as true, do not demonstrate either (1) that she engaged in speech as a citizen on a topic of public concern or (2) that she suffered an adverse employment action as a result of her speech. Next, the Court addresses Marchman's argument that this traditional framework does not apply to her because she is an elected official. While this argument is more persuasive, Marchman's claims nonetheless fail under all of the alternate legal frameworks she offers for analyzing her claims.

### i. Marchman Engaged in Speech in the Course of Her Ordinary Job Duties and Not as a Citizen.

Marchman is an elected Louisiana district judge whose salary is paid by the State of Louisiana. See La. House of Representatives, House Legislative Servs., State and Local Government in Louisiana: An Overview, Eleventh Revision, at 1B-6 (October 2011) (salaries of district court judges are funded through an annual legislative appropriation). As such, though she may be a unique employee as the holder of an elected office created

by the Louisiana Constitution, she is nonetheless a "public employee" for the purposes of § 1983 causes of action. See infra at Section II, A, ii; see La. Const. art. V, §§ 14-15; see La. R.S. 42:1. The first element a public employee must prove when claiming a violation of First Amendment rights is that he or she engaged in speech in her capacity as a citizen on a topic of public concern. See Garcetti, 547 U.S. at 421-22; see also Howell, 827 F.3d at 522-24. Garcetti clarified that even though a public employee's speech may be on a topic of public concern, the employee must have engaged in the speech in her capacity as a citizen rather than in the course of her job duties for the speech to be protected by the First Amendment. See Garcetti, 547 U.S. at 420-22; see also Howell, 827 F.3d at 522-24.

The original plaintiff in Garcetti, Ceballos, was an assistant district attorney who wrote a memo questioning the decision to file charges against a criminal defendant on the basis of an affidavit that Ceballos found questionable. 547 U.S. at 413-15. His superiors disagreed with the conclusions in the memo, and decided to go forward with charges against the criminal defendant in the case. See id. Ceballos was later transferred to another division and denied a promotion. See id. He then filed suit on the basis that these actions were taken in response to his memo, alleging that the memo constituted protected First Amendment speech. See id. The Supreme Court rejected this argument, holding that because Ceballos' job duties included writing memos like the memo in question, his memo was not protected speech under the First Amendment. See id. at 421.

In Lane v. Franks, the Supreme Court again applied the rule from Garcetti, but in Lane it found that the plaintiff had engaged in speech as a citizen and not in the course of his ordinary job duties. 134 S. Ct. 2369 (2014). There, Lane was the director of a

community college youth program who discovered evidence that a person on the payroll of the program who was also an Alabama State Representative, Suzanne Schmitz, had not been working the hours she reported. See id. at 2374-76. Lane fired Schmitz, and the FBI investigated Schmitz for her actions. See id. at 2375. Lane testified both before a federal grand jury and at the eventual trials[7] of Schmitz. See id. The president of the community college later fired Lane and twenty-eight others, ostensibly because of the need for budget cuts. See id. at 2376. However, the president later rescinded all but two of the firings, with Lane being one of the two employees who were not re-hired. See id.

Lane filed suit after he was not re-hired, but his suit was dismissed on summary judgment in the district court; the Eleventh Circuit affirmed. See id. The Supreme Court reversed. See id. at 2378-79. Distinguishing Garcetti, the Court stated: "the sworn testimony in this case is far removed from the speech at issue in Garcetti—an internal memorandum prepared by a deputy district attorney for his supervisors recommending dismissal of a particular prosecution." Id. at 2379. In Lane, by contrast, Lane's speech to a grand jury, though it regarded facts he became aware of through his employment, was speech "as a citizen" because it was not "ordinarily within the scope of [his] duties" as the director of the youth program. Id.

The conclusion that Marchman engaged in all of the speech involved in the instant case as a part of her job duties rather than as a citizen aligns with the above case law. As was the case in Garcetti, in the instant case Marchman's speech fell within her duties as both a Louisiana district judge and the head of the personnel committee for the Fourth JDC. See Record Document 22 at ¶¶ 19, 29-33, 38, 51, 54, 60-62, 67-69. In fact,

---

[7] The first trial ended in a mistrial, but Schmitz was convicted upon retrial. See id.

Marchman's own allegations admit that Marchman spoke out against Campbell and against the protection the Defendant judges allegedly provided Campbell in Marchman's role as both a judge and as head of the personnel committee. She quotes Canons 1, 2, and 3 of the Louisiana Code of Judicial Conduct as reasons why she spoke out against Campbell, stating several times that she is "trying to discharge the duties set forth" in these three canons by speaking out against Campbell and trying to "hold staff to the same standards of fidelity to which she is held." Id. at ¶¶ 90-95. Therefore, Marchman's own allegations take her speech outside of the limited protection the First Amendment offers to speech by public employees.

Additionally, though "not dispositive," the fact that Marchman's speech took place almost entirely inside the workplace strongly favors the conclusion that Marchman's speech occurred in the course of her ordinary job duties and was not speech as a citizen. Garcetti, 547 U.S. at 420. The speech at issue consisted almost entirely of intra-court communications with the other judges of the Fourth JDC and its staff. See Record Document 22 at ¶¶ 19, 29-33, 38, 51, 54, 60-62, 67-69. Most, though not all, plaintiffs in First Amendment claims by public employees that have prevailed on this element engaged in speech that involved some degree of publication of the speech beyond the workplace. See, e.g., Howell, 827 F.3d at 519-24 (police officer engaged in protected speech when he helped the FBI investigate mayor's fraud); Scott v. Flowers, 910 F.2d 201, 210-12 (5th Cir. 1990) (justice of the peace who wrote an open letter to county officials about the practice of dismissing appeals from his court to the county court at law engaged in protected speech in writing this letter); Harris v. Victoria Indep. Sch. Bd., 168 F.3d 216, 219-223 (5th Cir. 1999) (teachers who had been appointed to a subcommittee

of a parent-faculty committee engaged in protected speech when they made statements critical of a principal at a subcommittee meeting); Moore v. Kilgore, 877 F.2d 364, 366-72 (5th Cir. 1989) (fireman who made statements to media regarding the effects of budget cuts by the city on the safety of its firemen engaged in protected speech); but see Rankin v. McPherson, 483 U.S. 378, 385-92 (1987) (deputy constable who made statements to her boyfriend regarding a presidential assassination attempt at her workstation, which was not accessible to the public, engaged in protected speech).

Thus, the context in which the speech is made is a factor to be considered in determining whether the plaintiff engaged in the speech as a citizen on a topic of public concern, and if the plaintiff engages in speech outside of the workplace itself, this factor weighs in favor of concluding that the speech is protected. See Connick v. Myers, 461 U.S. 138, 147-48 (1983). In the instant case, however, this factor weighs in favor of concluding that Marchman's speech was not protected speech, as she engaged in most of it in the course of her ordinary job duties at the Fourth JDC courthouse itself, primarily in judges' committee meetings and private discussions with other judges and Fourth JDC personnel. See Record Document 22 at ¶¶ 19, 29-33, 38, 51, 54, 60-62, 67-69.

Even the one instance in which Marchman engaged in any actions or speech in a public context, when she made her return on the subpoena duces tecum at the August 20, 2015, hearing in the Palowsky v. Cork matter, does not constitute constitutionally protected speech. See id. at ¶ 69. There, she simply spoke up in court regarding the subpoena and made the court aware that she was prepared to comply with it. See id. After an argument on the record with Sharp about their previous discussion of the subpoena duces tecum, Sharp allowed Marchman to give the documents she had brought

to court to counsel for Palowsky. See id. Thus, the only statements she made outside of the context of the Fourth JDC's internal meetings and discussions regarding Campbell were merely related to the procedure of complying with the subpoena duces tecum and did not convey any information or opinions regarding Campbell's alleged misdeeds. As such, her statements at the hearing were not speech as a citizen on a topic of public concern.

Nor did Marchman's compliance with the subpoena duces tecum by handing over the documents in question constitute protected First Amendment speech. Compliance with a subpoena duces tecum is fundamentally different from giving sworn testimony in court pursuant to a subpoena ad testificandum. As the Court explained in Lane, testifying in court imposes an obligation upon the witness "to speak the truth," an obligation that is "distinct and independent from" any obligations to the witness's employer. 134 S. Ct. at 2379. This fact "renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee."[8] Id. By contrast, a subpoena duces tecum merely requires the party to whom it is directed to produce "all the documents  . . . which are in his possession or control relating to any matter with respect to which the action is pending, or specified documents" that meet the same criteria. La. R.S. § 13:4870. Thus,

---

[8] It should be noted, however, that the Supreme Court left open the question of whether government employees who regularly provide testimony in court as part of their ordinary job duties engage in protected First Amendment speech when they provide such testimony. See Lane, 134 S. Ct. at 2384 (Thomas, J., concurring). Though the plaintiff in Garcetti, Ceballos, had testified in a hearing regarding the conclusions in his memo, the Ninth Circuit had only addressed the question of whether the memo itself was protected speech. See Ceballos v. Garcetti, 361 F.3d 1168, 1173 (9th Cir. 2004). Thus, the question of whether the hearing testimony was protected speech was not before the Supreme Court in Garcetti, and it appears from Lane that whether such testimony is protected speech remains undecided.

compliance with a subpoena duces tecum is not speech at all, but merely a procedural act in compliance with a court order; as such, Marchman cannot base her First Amendment claim upon her compliance with the subpoena. See id.

ii.   **Marchman Has Not Alleged an Adverse Employment Action.**

Marchman's First Amendment claims also fail because her factual allegations, taken as true for the purposes of the instant Motions to Dismiss, do not contain any adverse employment actions by Defendants. An adverse employment action is a necessary element in an action by a public employee claiming that her First Amendment rights were violated, and the failure to adequately allege such an action is fatal to a plaintiff's claim. See Garcetti, 547 U.S. at 421-22; Howell, 827 F.3d at 522; McCoy v. City of Shreveport, 492 F.3d 551, 556-63 (5th Cir. 2007).

In the instant action, the factual allegations Marchman makes that could arguably constitute an adverse employment action are: (1) that Jones tried to pressure her into recusing herself from an investigation of an employee that had requested that Marchman do so without providing a reason for why Marchman should do so; (2) that Marchman resigned as both a member of the personnel committee and the chairwoman of the personnel committee in reaction to the Defendant judges' opposition to her actions in that capacity; (3) that Sharp spoke to her in a threatening manner at the August 20, 2015 hearing on the motion to recuse in Palowsky v. Cork; (4) that Sharp threatened to seek an *en banc* admonishment of Marchman by the Fourth JDC judges for her actions at the same hearing; (4) that Rambo was rude to Marchman and intentionally bumped into her in an incident at an elevator in the Fourth JDC; (5) that Campbell's attorneys Crawford, Pettiette, and Caldwell, with the help of Guice, filed pleadings in Palowsky v. Campbell in

which they made false accusations against Marchman; (6) that the Defendant judges voted to require pre-approval by the chief judge of all photographs or videos to be taken in the Fourth JDC, allegedly to prevent Marchman from receiving positive media coverage; and (7) that Sharp refused to add Marchman to his contact list for committee meetings and refused to serve on any committees with Marchman. See Record Document 22 at ¶¶ 60-62, 69-84.

These factual allegations simply do not fall within the same category of actions that have been held to constitute adverse employment actions under jurisprudence interpreting this requirement. The requirement that a plaintiff demonstrate an adverse employment action is generally not a high bar to clear. Though the Fifth Circuit has been reluctant to expand the list of actions that can satisfy the adverse employment action element, a variety of actions that have a negative effect upon a public employee's status as an employee may satisfy this element. See Pierce v. Tex. Dep't of Criminal Justice, Institutional Div., 37 F.3d 1146, 1149-50 (5th Cir. 1994). These actions include "discharges, demotions, refusals to hire, refusals to promote, and reprimands." Harris, 168 F.3d at 221.

The Court notes that the instant case is somewhat unique because the plaintiff is an elected judge with a set term rather than a typical, non-elected government employee with a supervisor against whom a variety of retaliatory employment actions could be taken. Because of Marchman's status as an equal to the Defendant judges and a superior to Campbell, there may be a more limited set of actions that Defendants could take against her that would satisfy the adverse employment action element. However, this fact does not remove the adverse employment action element as a requirement in a First

Amendment claim by a public employee. See Scott, 910 F.2d at 212-13 (holding that a formal reprimand of plaintiff justice of the peace by the Texas Commission on Judicial Conduct constituted an adverse employment action); Colson v. Grohman, 174 F.3d 498, 507-514 (5th Cir. 1999) (affirming district court's summary judgment for defendants when plaintiff, an elected city council member, failed to meet adverse employment action element in First Amendment claim).

The relative uniqueness of the instant case also does not affect the Court's conclusion that Marchman's allegations do not meet this element. At most, taking Marchman's allegations as true, some Defendants' actions in the instant matter may constitute unfriendly, rude, or perhaps less than professional conduct, criticism of Marchman's attempts to have Campbell fired, an unsuccessful and/or ultimately abandoned attempt at discussing the propriety of Marchman's actions[9], changing Fourth JDC policies regarding photographs in the courthouse, battery, and defamation.[10] These actions simply do not constitute adverse employment actions under relevant jurisprudence. See Colson, 174 F.3d at 512 (criticism, false accusations, and even an attempt to launch a criminal investigation into the false accusations do not constitute adverse employment actions); McCoy, 492 F.3d at 558 ("boorish remarks and childish horseplay" do not constitute adverse employment actions).

---

[9] See Record Document 22 at ¶ 72, discussing Sharp's "confidential" agenda matter that the judges never actually discussed.

[10] The Amended Complaint alleges only federal civil rights causes of action. See Record Document 22. To the extent that the Amended Complaint intended to allege any state law causes of action such as battery or defamation, the Court declines to exercise supplemental jurisdiction over such state claims in light of the Court's decision that Marchman's factual allegations do not state any federal civil rights claims. See 28 U.S.C. § 1367(c)(3).

The loss of Marchman's status as a member and head of the personnel committee, as a loss of standing or position akin to what is suffered in a demotion or official reprimand, could constitute an adverse employment action. However, as Defendants point out, Defendants did not remove Marchman from this position. See Record Document 22 at ¶¶ 61-62. By resigning, Marchman voluntarily chose to leave this position herself, and in any event many of the Defendants (Guice, Caldwell, Campbell, Pettiette, and Crawford) would have had no power to remove Marchman from this position even if they had wanted to do so. See id. Additionally, though a successfully passed official admonishment by her fellow judges would also meet this element, see Scott, 910 F.2d at 212-13, the Fourth JDC judges never actually considered or voted on such a motion, much less passed one. See id. at ¶¶ 70, 72. The Fourth JDC judges' decision to regulate photographs at the courthouse is a facially neutral, universally applicable regulation of the court's policies that is well within the power of the district court, and does not constitute an adverse employment action against Marchman. See id. at ¶ 81; see La. Const. art. V, § 17 (chief judge of district court shall exercise the administrative functions prescribed by rule of court); see La. C.C.P. art. 193 (power of courts to adopt local rules).

Finally, Marchman's allegations regarding Sharp's refusal to include her on the email list for committee members and to serve on committees with her also do not constitute adverse employment actions. Sharp's refusal to serve on committees with Marchman simply does not affect her employment in the same way "discharges, demotions, refusals to hire, refusals to promote, and reprimands" affect a public employee's employment. Harris, 168 F.3d at 221.

There is a marginally stronger argument that Sharp's refusal to include her on the email list for committee meetings constituted an adverse employment action. This was an intentional omission by Sharp that might in some minor way affect Marchman's ability to perform her job (such as if she does not receive notice of a committee meeting) and could be interpreted as a form of official reprimand.[11] There is dicta by the Supreme Court indicating that a *de minimis* action may satisfy the adverse employment action element. See Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990) ("the First Amendment . . . protects state employees . . . from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights"). However, this dicta has received criticism, and the Court finds that such a *de minimis* action as a refusal to send committee meeting emails to Marchman by a fellow judge cannot constitute the type of action that may satisfy the adverse employment action element. See Colson, 174 F.3d at 510-11 (noting criticism of this dicta, especially within the Fifth Circuit, and stating that "there may be some minor adverse actions that would not" meet this element); see also Pierce, 37 F.3d at 1149 n.1 (deciding that this dicta in Rutan was not to be taken literally). Thus, Marchman's Amended Complaint fails to allege any actions by Defendants that would constitute an adverse employment action.

---

[11] The inference that the failure to include Marchman on the email list for committee meetings is a form of official reprimand is rather weak, particularly in light of the chief judge's request that she be included on the list. See Record Document 22 at ¶ 82. However, the Court must take all of Marchman's allegations as true for the purposes of the instant Motions, and has indulged some factual inferences in her favor because of the early stage of the case.

### iii.    Marchman's Allegations Do Not State a First Amendment Retaliation Claim Under Any Alternate Framework

Marchman also argues that the traditional framework for analyzing First Amendment claims by public employees, as modified by <u>Garcetti</u> to only protect public employee speech engaged in by the employee in her capacity "as a citizen," does not apply to her claims. <u>See</u> Record Document 92 at 9-11. Instead, she argues that either (1) the public employee framework without the "as a citizen" requirement applies, or (2) the framework applicable to freedom of speech claims by private citizens applies. <u>See id.</u> Confusingly, Marchman relies upon <u>Jenevein v. Willing</u>, 493 F.3d 551 (5th Cir. 2007), for this argument, a case that actually applied a strict scrutiny analysis to determine whether an action violated an elected official's First Amendment rights. Thus, Marchman actually offers three alternate legal frameworks under which her claims could be analyzed.

The Court has reviewed <u>Jenevein</u> and other precedent supporting this argument, and finds that there is some merit to the position that <u>Garcetti</u>'s "as a citizen" requirement does not apply to cases involving First Amendment claims by elected officials. <u>Jenevein</u> involved a First Amendment claim under § 1983 by an elected Texas judge. <u>See</u> 493 F.3d at 552-57. The Texas Commission on Judicial Conduct had censured the judge for holding a press conference in which he denounced actions taken by an attorney. <u>See id.</u> There, the court stated that "we are persuaded that the preferable course ought not draw directly upon the <u>Pickering-Garcetti</u> line of cases for sorting the free speech rights of employees elected to state office." <u>Id.</u> at 558. Instead, the Court applied the strict scrutiny test in evaluating whether the censure of the judge's statement was an unconstitutional infringement upon the judge's First Amendment rights. <u>See id.</u> In a subsequent case, another Fifth Circuit panel agreed that the traditional framework for analyzing First

Amendment retaliation claims by public employees did not apply to claims by elected public officials. See Rangra v. Brown, 566 F.3d 515, 522-26 (5th Cir. 2009), vacated by Rangra v. Brown, 584 F.3d 206 (5th Cir. 2009) (en banc) (vacating on mootness grounds without addressing the merits).

It appears that the majority of courts that have addressed this issue have at least partially agreed with Jenevein and Rangra by holding that Garcetti's "as a citizen" requirement does not apply to First Amendment retaliation claims by elected officials. See Werkheiser v. Pocono Twp., 2016 U.S. Dist. LEXIS 133053 at *7-16 (M.D. Pa. 2016) (reviewing cases that have addressed the question, including Jenevein and Ranga). However, the Court notes that the facts of Jenevein are extremely different from the facts in the instant action, as the speech there was made at a public press conference and the government action in retaliation, taken by the state Commission on Judicial Conduct and not by fellow judges, was expressly and publicly directed at retaliating against the plaintiff for his speech. See 493 F.3d at 551-57. The panel opinion in Ranga is also not precedential, as it has been vacated by the Fifth Circuit's en banc decision that the case was moot. See Rangra, 584 F.3d at 207. Additionally, in several pre-Garcetti cases involving First Amendment retaliation claims by elected officials, the Fifth Circuit did apply the traditional framework for analyzing First Amendment claims by public employees. See Scott, 910 F.2d at 210-13; see Colson, 174 F.3d at 507-514.

Ultimately, it is not necessary to decide which framework is applicable to First Amendment retaliation claims by elected officials, as Marchman's claims fail under all of them. First, if the Court accepts Marchman's argument that the traditional framework applies without Garcetti's "as a citizen" requirement, Marchman still must allege that she

suffered an adverse employment action. See Kinney v. Weaver, 367 F.3d 337, 356 (5th Cir. 2004) (en banc) (listing the elements of a public employee First Amendment claim prior to Garcetti). This appears to be the course taken in Werkheiser, with the court holding that the plaintiff (an elected member of a township's Board of Supervisors) had not shown that the defendants had taken a retaliatory action against him. 2016 U.S. Dist. LEXIS 133053 at *16-22 ("elected officials who are retaliated against by their peers have limited recourse under the First Amendment when the actions taken against them do not interfere with their ability to perform their elected duties"). As discussed in Section II, A, ii, supra, Marchman failed to allege any actions by Defendants that meet this element, so her claim would still fail.

Second, Marchman's assertion that the framework applicable to First Amendment retaliation claims by private citizens should apply to her claims appears unsupported by any precedent, even the case to which she cites. Marchman cites to Culbertson v. Lykos, 790 F.3d 608, 618 (5th Cir. 2015) for this argument, which lists the elements for private citizens as follows: "(1) they [the plaintiffs] were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." See Record Document 92 at 9-10.

However, this case never actually applied the private citizen framework to the plaintiffs' First Amendment claims, but instead applied the public employee framework. See id. at 617-621. There, the plaintiffs based some claims on speech made while they were public employees and some on speech made while they were employees of

government contractors. See id. The Court only analyzed the plaintiffs' claims under the public employee framework, holding that this framework also applied to claims by employees of government contractors. See id. at 618, 621. It seems the only reason the court cited the private citizen framework was to recognize that another framework with different elements exists, but did not apply. Additionally, Marchman was a judge when she made all relevant statements in the instant action, so it would make little sense to apply a private citizen framework to her statements. Thus, the Court rejects her argument that the elements for a First Amendment claim by a private citizen apply in the instant action.

Third, even if the strict scrutiny standard the Fifth Circuit applied in Jenevein applies in the instant action, Marchman's allegations fail to state a claim upon which relief can be granted. Strict scrutiny requires the state actor's regulation of the plaintiff's speech to be "narrowly tailored to address a compelling government interest." Jenevein, 493 F.3d at 558. Here, there has been no regulation at all of Marchman's right to freedom of speech. As discussed in Section II, A, ii, supra, regarding the adverse employment action element, the Defendants have taken no actions against Marchman to constrain her speech above mere intra-court social pressure and actions that could be considered unfriendly, rude, or less than professional. These actions differ drastically from the official censure by the Texas Commission on Judicial Conduct discussed in Jenevein, 493 F.3d at 552-57, or the criminal statute found to be a content-based regulation of speech in Rangra, 566 F.3d at 520-22. As such, even if a different framework applies to her claims than the traditional framework that has been applied to First Amendment retaliation claims

by public employees, Marchman's allegations fail to state a claim upon which relief can be granted.

### B.  Marchman's Fourteenth Amendment Equal Protection Claims

In their Motions to Dismiss, Defendants argue that Marchman has not stated an equal protection claim under either (1) the traditional equal protection framework or (2) the "class of one" exception. <u>See</u> Record Documents 26, 35, 37, 40, 47, and 90. Marchman argues that she has stated equal protection claims under both the traditional framework and the "class of one" exception. <u>See</u> Record Documents 28, 55, and 92.

### i.     Marchman's Allegations Do Not State a Gender-Based Equal Protection Claim.

Neither Marchman's Original Complaint nor her Amended Complaint mention the fact that she is the only female judge of the Fourth JDC. <u>See</u> Record Documents 1 and 22. Marchman makes no allegation that Defendants violated her right to equal protection because of her gender in these filings. <u>See id.</u> However, in Marchman's combined Memorandum in Opposition to Guice, Crawford, and Campbell's Motions to Dismiss, Marchman raises a gender-based equal protection claim for the first time. <u>See</u> Record Document 55 at 32-33. Marchman contends that her allegations (1) that the Defendant Judges referred to her disagreements with Campbell as a "cat fight" and (2) that the Defendants subjected her to "threats, intimidation, and even intentional physical contact" are nonetheless sufficient to state a traditional, gender-based equal protection claim. Record Document 55 at 32-33.

The Court disagrees. The fact that Marchman first raised this argument in an opposition memorandum to a Motion to Dismiss is dispositive. <u>See</u> <u>Halter v. Allmerica Fin. Life Ins. & Annuity Co.</u>, 1998 U.S. Dist. LEXIS 13250 at *15 (E.D. La. 1998) ("it is

axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss"), citing Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir. 1989). The section of the Amended Complaint in which Marchman details her Fourteenth Amendment equal protection claims make no mention of her gender, stating only that the Defendants violated her rights under the Equal Protection Clause by "singling her out for unfavorable treatment without adequate justification" and "creating a hostile work environment." Record Document 22 at ¶¶ 106-114. Marchman cannot now use a Memorandum in Opposition to the Motions to Dismiss to add new allegations to her Amended Complaint.

Furthermore, the only factual allegation in the Amended Complaint that can reasonably be interpreted as a gender-based allegation, albeit without any express mention of gender as the alleged motivation for Defendants' treatment of Marchman, is the allegation that the Defendant Judges referred to the disagreement between Marchman and Campbell as a "cat fight." Id. at ¶ 63. The Court notes that Marchman makes no allegation that Campbell, Crawford, Guice, Pettiette, or Caldwell made any such statement. Even taking it as true that the Defendant judges referred to this conflict as a "cat fight," this amounts to more behavior that could be considered unfriendly, rude, or something less than professional. Additionally, the Court finds that such statements, taken alone, do not amount to a sufficient factual basis upon which Marchman can base a gender-based Fourteenth Amendment equal protection claim.

### ii.    Marchman's Allegations Do Not State an Equal Protection Claim Under the "Class of One" Exception.

Because Marchman's Amended Complaint contains no references to a protected class, it appears that the Amended Complaint attempts to state a "class of one" equal

protection claim. The "class of one" exception stands as a narrow exception to the requirement that a plaintiff plead that he or she is a member of a protected class to state an equal protection claim. See Olech, 528 U.S. at 564-65. In Engquist, the Supreme Court held that, as a matter of law, the "class of one" exception to the requirement that a plaintiff allege membership in a protected class in an equal protection case does not apply in the public employee context. 553 U.S. at 609. Thus, a public employee seeking to sue on the basis that "the State treated [him or her] differently from others for a bad reason, or for no reason at all," simply does not have an equal protection claim. Id. In applying the rule from this case, the Fifth Circuit has briefly addressed and quickly dismissed public employee equal protection claims under the "class of one" exception. See Klingler v. Univ. of S. Miss., 612 Fed. Appx. 222, 232 (5th Cir. 2015). On this basis, Defendants argue that Marchman has therefore failed to state an equal protection claim. See, e.g., Record Documents 37-1 at 14 and 67 at 9-10.

The Court agrees with Defendants. Because Marchman is a public employee, the Engquist rule that public employees cannot state a "class of one" equal protection claim as a matter of law applies in the instant action. 553 U.S. at 509. However, as a portion of the rationale behind Engquist is inapplicable to the instant case, the Court finds it necessary to further explain why the rule in Engquist controls despite this difference. In Engquist, an employee ("Engquist") of the Oregon Department of Agriculture ("ODA") experienced repeated problems with another employee and complained to her immediate supervisor about that employee; the supervisor punished that employee by directing him to attend anger management and diversity training. 553 U.S. at 594-95. Later, a new supervisor assumed responsibility over her entire unit, and stated that "he could not

'control' Engquist, and that [she and her immediate supervisor] 'would be gotten rid of'." Id. at 594. This new supervisor chose the employee with whom Engquist had reported problems over Engquist for a promotion even though Engquist had more experience. See id. at 595. Engquist was later informed that her position was being eliminated because of reorganization, and she chose not to take a demotion in lieu of being laid off. See id.

Engquist filed suit against the new supervisor, the other employee, and the ODA, alleging violations of federal antidiscrimination statutes, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and state law. See id. Her equal protection claims included both "traditional" class-based claims and a "class of one" claim. See id. Engquist obtained a jury verdict on her "class of one" claim. See id. at 596. The Ninth Circuit reversed, holding that the "class of one" equal protection theory is inapplicable in the public employment context. See id.

The Supreme Court affirmed. See id. at 597. The Court stated that "our traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations applicable when the government acts as employer as opposed to sovereign, lead us to conclude that the class of one theory of Equal Protection does not apply in the public employee context." Id. at 598. Expanding upon this latter rationale, the Court explained that the government has "significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." Id. at 599. "Some forms of state action . . . by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." Id. at 603. The public employment context involves such a form of state action, because "employment decisions are quite often

subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." Id. at 604. "Thus, the class-of-one theory of equal protection–which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review–is simply a poor fit in the public employment context." Id. at 605.

Obviously, the need for local and state governments to have discretion in employment matters (specifically in hiring and firing employees, as was the case in Engquist) that partially formed the basis of the Supreme Court's decision in Engquist is not entirely applicable in the instant case. Though Marchman, like Engquist, is a public employee basing her "class of one" equal protection claim on the allegation that Defendants treated her differently "for a bad reason," Marchman is not an employee who could be fired like Engquist. Id. at 606. However, the Court finds that this distinction does not render Engquist's holding that "class of one" equal protection claims cannot proceed in the public employment context inapplicable here. First, the fact that Marchman could not be fired does not mean that a state district court, like other branches of government, does not need a similar type of discretion in its employment matters. Louisiana district courts, acting through their chief judge or their judges in concert, are generally granted the authority to control their internal operations. See, e.g., La. Const. art. V, § 17 (chief judge of district court shall exercise the administrative functions prescribed by rule of court); see La. C.C.P. art. 193 (power of courts to adopt local rules). Internal politics and employment decisions within a Court (or any workplace) can at times become rancorous and lead to intense disagreement, even to rude or unprofessional behavior. Courts, like all public employers, maintain a certain amount of discretion in reacting to such

employment issues without being overly concerned that their internal employment decisions constantly create "class of one" equal protection claims.

Second, in addition to the need for discretion in employment matters discussed above, in deciding Engquist, the Court expressly analogized equal protection claims by public employees to First Amendment claims by public employees. 553 U.S. at 599-600. The Court then incorporated some of the rationale behind the Court's First Amendment jurisprudence in its decision, stating that "in the public employee context . . . we consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more easily give way to the requirements of the government as employer." Id. at 600.

Applying this principle to the instant case, the Court finds that the analysis of the adverse employment action element in Section II, A, ii, *supra*, is also applicable to Marchman's equal protection claim. The adverse employment action element is obviously meant to ensure that a plaintiff demonstrate some action taken against him or her in retaliation for his or her speech that is significant enough to implicate the plaintiff's constitutional rights. As explained in Section II, A, ii, *supra*, Marchman's allegations do not include any of the types of retaliatory actions that can satisfy the adverse employment action element.

Similarly, the Court finds that Marchman's allegations do not include the same types of harm suffered by plaintiffs in "class of one" equal protection claims. Plaintiffs in those cases, like plaintiffs who have demonstrated adverse employment actions, have suffered some form of harm (often economic) easily measurable in relation to others similarly situated, and have used that difference in treatment as the basis for their equal

protection claims. In <u>Olech</u>, a village demanded a thirty-three foot easement from Olech as a condition to connecting her property to the municipal water line; only a fifteen-foot easement had been required of other property owners in her subdivision, and the village did not provide any explanation for the difference in treatment. 528 U.S. at 563-65. Both <u>Sioux City Bridge Co. v. Dakota County</u>, 260 U.S. 441 (1923) and <u>Allegheny Pittsburgh Coal Co. v. County Comm.</u>, 488 U.S. 336 (1989), upon which the Supreme Court relied in <u>Olech</u>, similarly dealt with arbitrary distinctions by a local government. Both of those cases involved an unexplained difference in valuation of the plaintiffs' properties and other persons' properties for local tax purposes. <u>See</u> <u>Engquist</u>, 553 U.S. at 602-03 (discussing these cases and basing the rationale for that decision upon the difference between these cases and the public employment context).

By contrast, Marchman has not suffered the type of harm that rises to a level implicating the Equal Protection Clause, but rather has only suffered the less serious harms discussed in Section II, A, ii, *supra*. Not only are those harms less serious than those found to implicate the Equal Protection Clause, but they also cannot be measured against any objectively verifiable standard, unlike the harms involved in the Supreme Court's existing "class of one" jurisprudence. "Government offices could not function if every employment decision became a constitutional matter," and "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." <u>Engquist</u>, 553 U.S. at 599. This fact is particularly true when the "employment" or "personnel" decisions the plaintiff complains of are of the variety present in the instant action (i.e., rude conduct, etc.). As such, the Court finds that Marchman's

allegations do not state a claim for an equal protection violation under the "class of one"
equal protection framework.

### C.  Marchman's 42 U.S.C. §§ 1985, 1986, and 1988 and 28 U.S.C. §§ 2201-2201 Causes of Action

Because Marchman's allegations, taken as true, do not amount to an actionable
deprivation of either First Amendment or Fourteenth Amendment rights, all of her
remaining claims must be dismissed. Marchman has no claim under § 1985(1), as this
subsection only provides a cause of action to officers of the federal government who claim
that two or more persons conspired to prevent him or her from discharging his or her
duties.[12] See Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998). Logically,
a plaintiff must state a claim for a constitutional violation to state a claim for a conspiracy
to commit a constitutional violation under § 1985; thus, the Court's decision that
Marchman has not stated a claim for a violation of either the First or Fourteenth
Amendments means that she has also failed to state a claim under § 1985. See Farrar v.
Bracamondes, 332 F. Supp. 2d 1126, 1131 (N.D. Ill. 2004) (when plaintiff has not
established a deprivation of a federal right, he cannot establish a conspiracy to deprive
him of a federal right under § 1985). By extension, if a plaintiff has not stated a claim for
a conspiracy to commit a constitutional violation under § 1985, then there can be no claim
for a failure to prevent such a conspiracy under § 1986. See Miss. Women's Med. Clinic
v. McMillan, 866 F.2d 788, 795 (5th Cir. 1989) (stating that the text of § 1986 itself dictates

---

[12] One district court held that a state judge may state a § 1985 cause of action even
though such a judge is not a federal official. See Lewis v. News-Press & Gazette Co., 782
F. Supp. 1338, 1342-43 (W.D. Mo. 1992). That decision is not binding on this Court.
Additionally, other than this one exception, "federal courts have uniformly rejected
attempts to extend [§ 1985(1)] to state or local government officials." Honan v. County of
Cottonwood, 2003 U.S. Dist. LEXIS 4605 at *36 (D. Minn. 2003).

that there must be a valid § 1985 claim before there can be a valid § 1986 claim). Finally, Marchman is also not entitled to declaratory or injunctive relief under 28 U.S.C. §§ 2201-2202 or attorney's fees under 42 U.S.C. § 1988 in light of the Court's holding that she failed to state a claim for a First or Fourteenth Amendment violation.

### D.  Marchman's Request for Leave to Amend Her Complaint

As an alternative argument in her opposition memoranda to Defendants' Motions to Dismiss, Marchman requests that the Court grant her leave to amend her Complaint a second time if the Court finds her factual allegations insufficient to state a claim for relief. See Record Document 55 at 37. Federal Rule of Civil Procedure 15 governs amended and supplemental pleadings. Where, as here, a party has already amended its pleading once under Fed. R. Civ. P. 15(a)(1), Fed. R. Civ. P. 15(a)(2) states that "a party may amend its pleading only with the opposing party's written consent or the court's leave." "The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Ultimately, however, the decision to grant leave to amend a complaint a second or successive time is at the discretion of the district court, and is subject to reversal only upon a finding of abuse of discretion. See Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006). A court may deny a movant's request for leave to amend for, *inter alia*, "futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

As discussed in the instant Memorandum Ruling, Marchman's factual allegations simply do not amount to a constitutional claim under the jurisprudence interpreting the First Amendment right to freedom of speech and the Fourteenth Amendment's Equal Protection Clause. Marchman has had two opportunities to plead factual allegations that would amount to such claims. Both her Original Complaint and her Amended Complaint,

at thirty-two and thirty-four pages respectively, set forth a very detailed factual account of the alleged multi-year conspiracy to violate her constitutional rights. <u>See</u> Record Documents 1, 22. The Court finds it extremely unlikely that Marchman left out important facts from these two Complaints that would alter the Court's conclusion that she does not have a constitutional claim under the First or Fourteenth Amendments. Therefore, the Court finds that further amendment to the Complaint would be futile.

## CONCLUSION

In addition to the jurisprudence discussed herein, the principle of judicial restraint supports the Court's conclusion that Marchman's claims must be dismissed. In the similar context of First Amendment retaliation claims by public school teachers, the Fifth Circuit has cautioned that "federal courts should be extremely hesitant to invade and take over in the area of education; a federal court is not the appropriate forum in which to seek redress over faculty disputes concerning teaching assignments, room assignments, administrative duties classroom equipment, teacher recognition, and a host of other relatively trivial matters." <u>Harris</u>, 168 F.3d at 220-21. This type of federal judicial restraint is also warranted, to an even greater extent, when the underlying complaint in the suit involves the internal operations and office politics of a state district court.

Marchman's factual allegations fail to state a claim for a violation of her First or Fourteenth Amendment rights under relevant jurisprudence interpreting such claims in the public employee context. As such, Defendants' Rule 12(b)(6) Motions to Dismiss (Record Documents 26, 35, 37, 40, 47, and 90) are therefore **GRANTED**. Defendants' Rule 12(b)(1) Motions to Dismiss are **DENIED** for the reasons contained in the Court's ruling on Pettiette's Rule 12(b)(1) Motion (Record Document 86).

A Judgment consistent with the terms of the instant Memorandum Ruling will issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, on this the 17th day of February, 2017.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE